SECURITIES INDUSTRIES
ASSOCIATION, Plaintiff,

v.

Robert L. CLARKE and Office of the
Comptroller of the Currency,
Defendants,

and

Security Pacific National Bank,
Intervenor–Defendant.

No. 87 Civ. 4504 (KTD).

United States District Court,
S.D. New York.

Dec. 19, 1988.

Rogers & Wells, New York City (James
B. Weidner, David A. Schulz, Mark Hol-
land, Peter Kimm, Jr., of counsel), for
plaintiff.

Rudolph W. Giuliani, U.S. Atty., S.D.
N.Y., New York City (Steven E. Obus,
Asst. U.S. Atty., Eugene M. Katz, L. Rob-
ert Griffin, Rosa M. Koppel, Office of the
Comptroller of the Currency, of counsel),
for defendants.

Cleary, Gottlieb, Steen & Hamilton, New
York City (Robert L. Tortoriello, Richard F.
Ziegler, of counsel), Cleary, Gottlieb, Steen
& Hamilton, Washington, D.C. (Kenneth L.
Bachman, Mitchell S. Dupler, Matthew D.
Slater, of counsel) and Security Pacific Na-
tional Bank, Los Angeles, Cal. (Russell A.
Freeman, Maurice K. DeWolff, Dan C. Aar-
dal, of counsel), for intervenor-defendant.

Davis Polk & Wardwell, New York City
(Robert B. Fiske, Jr., Bruce W. Nichols, of
counsel), for New York Clearing House
Ass'n, amicus curiae.

## MEMORANDUM & ORDER

KEVIN THOMAS DUFFY, District
Judge:

This action is an appeal from a decision
of Robert L. Clarke, Comptroller of the
Currency ("the Comptroller") interpreting
the Glass–Steagall Banking Act of 1933,
Pub.L. No. 73–66, 48 Stat. 162 (codified as
amended in scattered sections of 12 U.S.C.)
("the Act"). Defendant Comptroller and
intervenor defendant Security Pacific Na-
tional Bank ("SPN Bank") move for dismis-
sal pursuant to Fed.R.Civ.P. 12(b)(1) or, in
the alternative, for summary judgment
pursuant to Fed.R.Civ.P. 56. The Comp-
troller also moves for dismissal pursuant to
Fed.R.Civ.P. 8(c). New York Clearing
House Association supports defendants'
motions as *amicus curiae*. Plaintiff Secu-
rities Industry Association ("SIA") cross-
moves for summary judgment pursuant to
Fed.R.Civ.P. 56. For the following reasons
SIA's motion for summary judgment is
granted.

## FACTS

In 1987 SPN Bank issued a prospectus and prospectus supplement describing a public offering of shares of private mortgage-backed pass-through certificates. The certificates, registered with the Securities Exchange Commission, represent an undivided percentage ownership in a trust that, in turn, represents a set pool of SPN Bank's conventional mortgage receivables. Once a group of mortgages are designated to a pool, the pool is fixed and the assignment to the pool trust is without recourse against SPN Bank. A separate bank serves as the pool trustee. The trust receives the principal and interest payments as they come due and will "pass-through" that income to the certificate holders. SPN Bank will service the individual mortgage loans held by the trust and distribute the monthly payments of income and principal, less a service charge earned by the bank, to the certificate holders.

Limited credit support for the certificates may be provided through one or more of the following: a SPN Bank standby letter of credit not to exceed ten percent of the initial principal balance of the pool, a limited guarantee by an entity other than SPN Bank, and third-party mortgage insurance on the lives of the borrowers obtained by SPN Bank. The remaining risks of non-payment of the mortgage loans are to be borne by the certificate holders. SPN Bank retains none of the risks associated with the underlying mortgages except where it provides its own letter of credit. Neither the certificates nor the underlying mortgage loans are insured or guaranteed by the Federal Deposit Insurance Corporation.

An underwriting agreement for the certificates was entered into between Kidder, Peabody & Co. ("Kidder") and SPN Bank. Under this agreement, SPN Bank will sell a portion of the certificates to the public, with the remainder to be sold by underwriters. Affidavit of M. Sava B. Thomas in Support of Defendants' Motion to Dismiss or in the Alternative for Summary Judgment ("Thomas Aff."), ¶ 9. The Prospectus Supplement also provides that both Kidder and SPN Bank will be underwriters for the certificates and "may, from time to time, buy and sell" the SPN Bank mortgage-backed certificates. Thomas Aff., Exh. A at S–7.

SIA is a trade association representing securities brokerage and investment banking organizations. Kidder is a member of SIA. SIA alleges that the form of SPN Bank's offering violates the national banking laws and that, by approving the offering, the Comptroller has permitted SPN Bank to violate those laws and to compete with and injure SIA's members.

### The Comptroller's Decision

In April 1987 SIA wrote to the Comptroller requesting review of the legality of SPN Bank's offering. In an opinion letter dated June 16, 1987, ("SPN Bank Letter") the Comptroller found that SPN Bank's offering does not violate the national banking laws. The Comptroller's opinion is based, in essence, on the conclusion that "the transaction in question, represents nothing more than the ... sale of bank assets." SPN Bank Letter at 6.

The SPN Bank Letter notes initially that the SPN Bank offering is substantially similar in form to mortgage asset sales devices used by other banks and approved by the Comptroller since the mid–1970's. Focusing on the sale of the SPN Bank's mortgages rather than the securities form of the offering, the Comptroller determines both that the transaction underlying the SPN Bank sales device is expressly permitted by the national banking laws and that the sales device designed by SPN Bank is not prohibited by the Glass–Steagall Act.

Express permission for a national bank's sale of its mortgage assets is found in such bank's: (1) statutory authority to carry on the business of banking such as negotiating promissory notes and other evidences of debt, (2) statutory authority to make and sell mortgage loans, and (3) legal incidents of ownership in general. SPN Bank Letter at 6–7 (quoting, respectively, 12 U.S.C. §§ 24 (Seventh); 12 U.S.C. § 371(a); Blacks Law Dictionary 997 (rev. 5th ed.1979)). In this context, the Comptroller emphasizes that the specific positive effects on the

banking industry that are served by allowing a bank to sell its mortgage assets, especially important given the current troubled condition of the banking industry and the national economy, include both liquidity of the bank's mortgage portfolio and management of maturity mismatch problems. SPN Bank Letter at 7.

Concluding that national banks have the authority to sell their mortgage assets, the Comptroller finds that the issuance of mortgage-backed certificates is a permissible means of accomplishing such a sale. SPN Bank Letter at 7. This conclusion is unchanged under the Comptroller's analysis of the certificate form as either a "new way" of performing a permitted bank activity or as an activity authorized as an incidental banking power. If the certificates fit in the former category, then the Comptroller finds that there is no need for separate authorization of the form. SPN Bank Letter at 7–8. If the certificates fit in the latter category, then the Comptroller finds that the form is authorized under even the most restrictive test enunciated by the courts. SPN Bank Letter at 9.

Although the Comptroller's analysis could end at this point, having determined that the offering of mortgage-backed securities is within SPN Bank's power under the national banking laws, the Comptroller further concludes that the certificates are not prohibited by the Glass–Steagall Act. This decision is based on the Comptroller's finding that the SPN Bank certificates are not within the definition of "securities" under the Glass–Steagall Act because, unlike mutual funds, the pooling of the underlying mortgages does not alter the fact that ownership of the certificates is substantially the same as owning those mortgages. Thus, the SPN Bank certificates are viewed by the Comptroller as assets that a bank may market, comparable to individual retirement fund assets ("IRAs") rather than to participation units in a collective fund for managed agency accounts. SPN Bank Letter at 10–11.

Even if the certificates are somehow determined to be securities, the Comptroller finds that the Glass–Steagall Act prohibitions, specifically §§ 16 and 21, remain inapplicable because SPN Bank is not an "underwriter." This finding is based on the determination that SPN Bank is selling its own assets rather than those of another issuer and that its power to issue its own securities encompasses the power to distribute and sell those securities to the public. SPN Bank Letter at 12–18.

Finally, the Comptroller finds that SPN Bank's program does not raise any of the hazards that the Glass–Steagall Act was intended to prevent because there is no danger of SPN Bank investing in speculative securities and there is no risk of SPN Bank's promotional interests interfering with its ability to act as an impartial source of credit or to render disinterested investment advice. The Comptroller supported this determination with the specific findings that: SPN Bank has no promotional interest in customer's securities and therefore no temptation to make unsound loans to influence the success of the offering; there is no possibility that SPN Bank would improperly advise a customer to profit from the distribution process or to use the proceeds to obtain repayment on outstanding loans; the possibility that the bank will retain ten percent of the risk is insufficient to cause unsound lending practices; SPN Bank's mortgage lending practice will not be affected; SPN Bank is unlikely to make unsound loans to deposit customers to encourage purchase of the certificates; and there is no risk that SPN Bank's reputation will suffer as a result of its identification with the certificates. SPN Bank Letter at 18–20.

## DISCUSSION

In reviewing an administrative agency's interpretation of a statute that is within the agency's regulatory jurisdiction, the agency's decision must be upheld only if it

'provides a reasonable construction of the statutory language and is consistent with legislative intent.' ... [H]owever, that deference is not to be a device that emasculates the significance of judicial review.... A reviewing court 'must reject administrative constructions of [a]

statute ... that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement.'

*Securities Industry Association v. Board of Governors of the Federal Reserve System*, 468 U.S. 137, 142–43, 104 S.Ct. 2979, 2982, 82 L.Ed.2d 107 (1983) ("*SIA I*") (quoting, respectively, *Securities Industries Association v. Board of Governors of the Federal Reserve System*, 468 U.S. 207, 217, 104 S.Ct. 3003, 3009, 82 L.Ed.2d 158 (1983) ("*SIA II*") and *Federal Election Commission v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981)). *See also Securities Industry Association v. Board of Governors of the Federal Reserve System*, 839 F.2d 47, 52 (2d Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 2830, 100 L.Ed.2d 931 (1988).

The relevant issue for review of the Comptroller's SPN Bank Letter is not simply whether or not banks can sell their assets such as their mortgage interests. Rather, the issue is whether banks can sell interests in a pool. Once a bank selects certain of its assets to be placed into a pool without recourse and offers to sell certificates of interest in that pool to the public, the assets as a group take on a separate identity. In finding that the bank can sell such interests, the Comptroller describes the trust pool as merely a "pass-through" of the underlying assets, the mortgage interests. Viewing the SPN Bank certificates this way, the Comptroller relies on the statutory authority of banks to, in general, "carry on the business of banking" and make and sell mortgage loans. *See*, respectively, 12 U.S.C. §§ 24 (Seventh), 371(a).

With or without a formal separate legal form, however, the trust constitutes a separate entity from the bank. The interests thus sold are not merely interests in the bank itself; the pool will have a life distinct from that of the bank. Contrary to SPN Bank's argument, the trust is not merely the technical issuer of the interests in the pool, it is the primary issuer. In accepting this argument the Comptroller has ignored the fact that the pool trust has a separate bank as trustee and there is, therefore, no true pass-through of assets. The certificate holders are not buying mortgages, they cannot foreclose on an individual mortgage, and they must look to the separate bank trustee to protect their interest in the individual mortgage. The SPN Bank has the sole choice of which mortgages it wants to shift to the trust. In this situation, there is no mere sale of assets and the general statutory banking powers are limited by specific statutory prohibitions.

■ A bank's sale of interests in a separate entity is an underwriting of securities prohibited by the Act. The Act's prohibitions against underwriting are contained primarily in 12 U.S.C. §§ 24 (Seventh), 378(a) (respectively, "§ 16," "§ 21"). These sections contain "the principal provisions that demarcate the line separating commercial and investment banking." *SIA I*, 468 U.S. at 148, 104 S.Ct. at 2985. On the one hand, § 16 limits a national bank's involvement in dealing in stock and securities and prohibits the underwriting of securities. On the other, § 21 prohibits, from the perspective of investment banks, any person engaged in issuing or underwriting securities from receiving deposits. The underwriting prohibitions in each section are considered coextensive. *Securities Industry Association v. Board of Governors of the Federal Reserve System*, 847 F.2d 890, 891 (D.C.Cir.1988).

Although neither section defines the terms "securities," "stocks," or "underwriting" the terms should be given their ordinary meaning. *SIA I*, 468 U.S. at 149, 104 S.Ct. at 2986. Based on a comparison with collective investment trusts, the SPN Bank and the Comptroller contend that the instruments at issue here are certificates that represent, in substance, an investment opportunity in the bank's assets rather than in securities. *See* SPN Bank Letter at 10–12. However, when the certificates are examined in terms of the definition of a security, an analysis of the law that the Comptroller did not undertake, the facts indicate otherwise.

The Supreme Court has found that certificates representing shares of interest in a housing cooperative are not stock, because

> [d]espite their name, they lack ... the most common feature of stock: the right to receive "dividends contingent upon an apportionment of profits." Nor do they possess the other characteristics traditionally associated with stock: they are not negotiable; they cannot be pledged or hypothecated; they confer no voting rights in proportion to the number of shares owned; and they cannot appreciate in value. In short, the inducement to purchase ... was not to invest for profit.

*United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 851, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1974) ("UHF") (quoting *Tcherepnin v. Knight*, 389 U.S. 332, 339, 88 S.Ct. 548, 554, 19 L.Ed.2d 564 (1967)). Quite the opposite situation is present here. Although the SPN Bank certificates do not appear to provide any voting rights, they do represent the right to receive apportioned interest profits, are negotiable, can be pledged or hypothecated, and can appreciate in value as the interest rate fluctuates.

Likewise, the SPN Bank certificates fit within the Supreme Court's decisions defining a security.

> The essential attributes that run through [these decisions is that t]he touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. By profits, the Court has meant either capital appreciation resulting from the development of the initial investment, ... or a participation in earnings resulting from the use of investors' funds.

*UHF*, 421 U.S. at 852, 95 S.Ct. at 2060 (citations omitted). Because the potential investors in the SPN Bank certificates will be " 'attracted solely by the prospects of the return' on [their] investment," the securities laws do apply. *Id.* at 852, 95 S.Ct. at 2060 (quoting *Securities Exchange Commission v. W.J. Howey Co.*, 328 U.S. 293, 300, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 *reh'g denied*, 329 U.S. 819, 67 S.Ct. 27, 91 L.Ed. 697 (1946)).

■ Under the securities laws, an "underwriter" is "one who unquestionably may participate in the primary or new issue market." *Securities Industry Association v. Board of Governors of the Federal Reserve System*, 807 F.2d 1052, 1059 (D.C.Cir. 1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 3228, 97 L.Ed.2d 734 (1987). "The critical attributes of underwriters, ... are that they either purchase securities from the issuer or act as the agent of the issuer." *Securities Industry Association v. Board of Governors of the Federal Reserve System*, 821 F.2d 810, 814 (D.C.Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 697, 98 L.Ed.2d 649 (1988) (citing *SIA II*, 468 U.S. at 217–18 n. 17, 104 S.Ct. at 3009 n. 17). In the Prospectus Supplement, SPN Bank is both named as an underwriter and described as an entity that will fulfill the role of an underwriter of the certificates. *See* Thomas Aff., Exh. A at S–7. Therefore, contrary to the premise underlying the Comptroller's conclusions, the SPN Bank program is not merely a sale of bank assets.[1] Rather, it is a prohibited underwriting of securities within the meaning of the securities laws.

The Comptroller's policy analysis, which takes into account a bank's need to raise available capital and the troubled economy, is irrelevant under the Glass–Steagall Act. Indeed, the elements relevant to the Comptroller's analysis indicate that commercial banks should not be in the business of selling assets to the public in this way. Rather than merely a means to facilitate the bank's needed liquidity and capital, reliance on sales of mortgage-backed certifi-

---

1. The Comptroller's opinion states:
   "An issuer that merely participates in the initial placement of its own securities with investors and does not subsequently engage in the business of repurchasing those securities, does not thereby enter into the 'business of underwriting' ... In this regard, we underscore the point that the activity in question is, in substance a sale of the Bank's assets."
   The Prospectus Supplement indicates that this opinion misstates both the facts of the activity at issue and the legal significance of the activity.

cates, as described by the Comptroller, also gives rise to an interest in the success of the sales. Such an interest conflicts with Congress' intent to separate the role of a commercial bank from the role of an advocate with an interest in supporting the sale of a particular security. *See SIA*, 468 U.S. at 145–47, 104 S.Ct. at 2983–84. As the Supreme Court has indicated: "when a bank puts itself in competition with [securities dealers], the bank must make an accommodation to the kind of ground rules that Congress firmly concluded could not be prudently mixed with the business of commercial banking." *Investment Co. Inst. v. Camp*, 401 U.S. 617, 637, 91 S.Ct. 1091, 1102, 28 L.Ed.2d 367 (1970).

Moreover, although the Comptroller recognizes legitimate concerns of the banking industry, he does not sufficiently consider the banking laws' purpose of protecting the investing public. If I were to agree that the trust certificates purchased by the public were not securities, then the public would not receive the full disclosure that is one of the protections of the securities laws. A bank could relegate to the trust those mortgages which it saw as most likely to be problems and full disclosure would not have to be made. Having once purchased the certificate, the innocent investor would be bereft of any of the protections of the securities laws, a situation repugnant to the present state of the law.

In sum, the Comptroller's statutory analysis is incomplete and inconsistent with the legislative intent and therefore must be rejected. The Comptroller's "functional analysis" does not take sufficient account of the role the bank may play in marketing the mortgage pool certificates and apparently ignores the benefits that the bank hopes to gain from the certificates. If Congress intended banks to be in the securities industry, the Glass–Steagall Act would have been revoked.[2] Congress has not done so, choosing instead to create exceptions where it believed them appropriate. *See, e.g.*, Housing and Urban Develop-

ment Act of 1968, Pub.L. No. 90–448, § 804, 82 Stat. 476. The present financial plight of the banking industry is more appropriately addressed by the Comptroller and the other bank regulatory agencies in their review of bank performance in the banking industry rather than by ignoring the restrictions placed on banks entry into the securities industry.

Accordingly, SIA's motion for summary judgment is granted and the Comptroller's and SPN Bank's motions are denied.

SO ORDERED.

---

**2.** As SIA has pointed out, Congress recently rejected an amendment to the Glass–Steagall Act that would have permitted banks to underwrite mortgage-related securities. SIA Mem. at 46

(citing S.Rep. No. 293, 98th Cong., 2d Sess. 9, *reprinted in* 1984 U.S.Code Cong. and Ad.News 2809, 2817).