In re NATIONAL MORTGAGE EQUITY CORPORATION MORTGAGE POOL CERTIFICATES SECURITIES LITIGATION.

MDL No. 647 AWT.

United States District Court, C.D. California.

June 12, 1989.

Styn and Garland, San Diego, Cal., for American Title Ins.

Alan M. Mund, Los Angeles, Cal., for Edward Garcia and American Heritage Financial Corp.

Julian S. Gould, Inc., Hollywood, Cal., for John Pennington.

Elliott Aheroni, Encino, Cal., for Clint Butcher.

Richard Reinis, Reinis, Reinis & Blum, Los Angeles, Cal., for Missouri Sav. Assoc.

Thomas E. Bandy, Bandy and Bandy, Walnut, Cal., for Robert K. Meeks.

Wehner and Perlman, A Law Partnership, Los Angeles, Cal., for NMEC and David Feldman.

Melvyn H. Wald and Alan D. Bersin, Munger, Tolles & Olson, and John C. Fauvre, Bank of America, Legal Dept., Los Angeles, Cal., for B of A, NT & SA.

Robert Winslow, Irell & Manella, Los Angeles, Cal., for Leslie Michael.

Alan E. Popkin, Lawrence J. Fleming and Gregory K. Laughlin, Popkin & Stern, St. Louis, Mo., for Ron Borgmann and Gerald Heitman.

Stephen D. Holz, Musick, Peeler & Garrett, Los Angeles, Cal., for Andrea Bennett, Comm. of Ins., St. of Montana, Liq. of Glacier Gen.

Frank A. Pace, Sr., San Gabriel, Cal., in pro. per.

Craig Reynolds, Long Beach, Cal., in pro. per.

Paul M. Dellamano, Torrance, Cal., for Wyndham Mooring.

Robert P. Varian, Brobeck, Phleger & Harrison, San Francisco, Cal., for Wells Fargo Bank, Natl. Assoc. and William Van Zile.

Frank Punelli, Jr. and Karen A. Petersen, Davis and Punelli, Newport Beach, Cal., for Fidelity Sav. Assoc.

Annette Dordoni, Office of Robert H. Bretz, Los Angeles, Cal., for George Ash.

Julian A. Pollok, Office of Julian A. Pollok, Los Angeles, Cal., for William Powers.

Orville A. Armstrong, Baker and McKenzie, Los Angeles, Cal., for Robert M. Sherrett.

George H. Link, Brobeck, Phleger & Harrison, Los Angeles, Cal.

Stephen B. Maseda, Anderson, Ablon, Maseda and Lewis, Los Angeles, Cal., for Stewart Title Guar. Co.

Kurt S. Melchior and Mark J. Kenney, Severson, Werson, Berke and Melchior, San Francisco, Cal., for Lomas & Nettleton, successor to advance.

Walter G. Coppenrath, Jr. and Daryl G. Parker, Mahoney and Coppenrath, Los Angeles, Cal., for John and Maureen Gillespie.

Carla M. Woehrle, Talcott, Lightfoot, Vandevelde, Woehrle and Sadowsky, Los Angeles, Cal., for Ben Adelman.

Arthur J. Shartsis and Mary Jo Shartsis, Shartsis, Friese & Ginsburg, San Francisco, Cal., for First Federal Sav. & Loan, Riverhead Sav. and Missouri Sav.

Terri J. Cleland, Merlino & Cleland, Huntington Beach, Cal., for Chris A. Peterson.

Jerry W. Ellinghouse, Woodland Hills, Cal., for Windjammer Investors.

Harold S. Nelson, Newport Beach, Cal., for Trenholm Bartlett.

Stuart L. Wallach, Orange, Cal., for Sandra Hobbs.

Richard Jackson, Belger and Norris, Redondo Beach, Cal., for Mary Brown.

Alan W. Curtis, Newport Beach, Cal., for West–Pac and Kent Rogers.

Stephen J. Hillman and Randall J. Kelley, Berman and Clark, Santa Monica, Cal., for John Carr and Steve Smith.

David L. Gernsbacher and Gerald J. Miller, Lurie and Hertzberg, Beverly Hills, Cal., for Capital Accumulation System.

Wayne A. McFadden, San Mateo, Cal., for Nathan & Deedee Ng.

Chris A. Peterson, Long Beach, Cal., in pro. per.

Floyd C. Anglin, Anaheim, Cal., in pro. per.

Randall L. Hite, Randall L. Hite & Assoc., Santa Ana, Cal., for Energy Resources and Marvin H. Weiss.

George Deroy, Hochman, Salkin and Deroy, Beverly Hills, Cal., for John C. Hayden.

Arthur A. Greenberg, Greenberg and Bass, Encino, Cal., for Shirley E. Stahlman.

Evelyn Balderman Hutt, Hufstedler, Miller, Carlson & Beardsley, Los Angeles, Cal., for B of A Employees–3rd Party and City Federal Sav. & Loan.

John A. Donovan, Skadden, Arps, Slate Meagher and Flom, Los Angeles, Cal., for Lord Bissell & Brook.

Benjamin J. Portugal, Los Angeles, Cal., for William and Stephanie Taylor.

Richard Marmaro, McCambridge, Deixler & Marmaro, Los Angeles, Cal., for John Hayden.

Harvey Besunder, Cruser, Hills, Hills and Besunder, Riverhead, N.Y., for Riverhead Sav. Bank.

Karen K. Williams, Nossaman, Guthner, Knox & Elliott, San Francisco, Cal., for Lomas & Nettleton Assoc. Consol.

John C. Doubek, Small, Hatch, Doubek & Pyfer, Helena, Mont., for John C. Hayden.

A. James Robertson, III, Howard, Rice, Memerovski, Canady, Robertson & Falk, San Francisco, Cal., for Terry Olson.

William V. McTaggert, Parker, Milliken, Clark, O'Hara and Samuelian, Los Angeles, Cal., for Glacier Gen. Assur.

Richard A. Ardoin, Bronson, Bronson and McKinnon, San Francisco, Cal., for Mebac, Inc.

Thomas W. Crawford and David W. Reimann, Crawford Blasdell & Reimann, Los Angeles, Cal., for Pacific West Appraisel.

Henry J. Stein, Mesirov, Gelman, Jaffe, Cramer & Jamieson, Tampa, Fla., for First Federal Sav. & Loan Assoc.

Robert J. Yorio, Owen, Wickersham & Erickson, San Francisco, Cal., for Umpqua Sav.

## MEMORANDUM DECISION RE "SECURITIES"

TASHIMA, District Judge.

### BACKGROUND

In January 1989, the Court heard and ruled on numerous motions for summary judgment in these multidistrict cases. Included in those motions were motions by defendants National Mortgage Equity Corporation ("NMEC"), David A. Feldman, Lord, Bissell & Brook ("LB & B"), Leslie Michael, Wells Fargo Bank, William Van Zile and The Lomas & Nettleton Company, successor to Advance Mortgage Company ("Advance") for summary judgment on plaintiffs' securities-based claims on the ground, *inter alia,* that the pooled, mortgage-backed certificates ("Certificates") at issue in these cases are not "securities" under federal and California state securities laws.[1] Because of the need for a prompt ruling on the motions, the rulings were made without providing an explanation of the basis therefor. The purpose of this Memorandum Decision is to set forth the basis of the Court's ruling that the Certificates are not "securities."

Earlier in this litigation the Court declined to decide this issue on Rule 12(b)(6) motions to dismiss, noting that, given the complexities of these cases, the issue could not be decided at the pleading stage, but required development of a factual record. *In re National Mortgage Equity Corp. Mortgage Pool Certificates Sec. Litig.,* 636 F.Supp. 1138, 1163–64 (C.D.Cal.1986) (*"NMEC I"*). That record has now been extensively developed on these motions for summary judgment.

"The principal purpose of the securities act is to protect investors by promoting full disclosure of information necessary to informed investment decisions.... We must focus on the economic realities of this particular transaction to determine whether these investors are in need of the protections of the securities act." *Matek v. Murat,* 862 F.2d 720, 728 (9th Cir.1988). De-

---

**1.** The definition of "security" under the Securities Act of 1933 and the Securities Exchange Act of 1934, as well as under California law, are substantially the same. *See NMEC I,* 636 F.Supp. at 1162 n. 2.

spite plaintiffs' professed belief that the Certificates were securities, the economic reality of the sale and servicing of the Certificates leads to a contrary conclusion: the Certificates are not securities.

## THE UNCONTROVERTED FACTS

The Certificates were marketed by NMEC through its own employees and through the use of brokers. All sales were made on a private placement basis. Two brokers, MEBAC and MorVest, handled the vast majority of the sales as co-brokers. Once MEBAC received information about available Certificates from NMEC, it relayed that information to MorVest. MorVest then contacted financial institutions through a variety of means, and sent out form offering letters. The brokers solicited at least eighty-five savings and loan associations and savings banks between 1981 and 1984.[2] If a prospective purchaser expressed interest, NMEC or the broker transmitted additional information. Next, either Feldman or another NMEC employee negotiated with the potential investor about the terms of the mortgage pool.

If negotiations proved successful, the parties then signed a commitment letter.[3] All of the letters outlined the same basic transaction: the Investor Institution[4] obligated itself to purchase a pool of second mortgages, collateralized by residential properties, yielding a standard pass-through rate.

Despite the standard structure of the transaction (and unlike other mortgage-backed instruments, such as Ginnie Maes), the commitment letters included a number of negotiable terms. For example, the letters listed the origination standards that NMEC had to employ when "underwriting" the individual loans prior to accepting them for a mortgage pool. The purchasing institutions could, and did, negotiate changes to

those standards. Similarly, various Investor Institutions negotiated for the right to: approve replacements for mortgages paid off in the pools' first four years, replace the financial guarantee bonds if the insurer proved unacceptable, extend the loans for six months beyond the five-year call period, and receive a guaranteed rate of return during the escrow period.

After signing the commitment letters, the Investor Institutions funded the escrow accounts, while NMEC purchased mortgages for the pools.[5] NMEC never had direct access to the funds and could only order disbursement by the escrow agent to the title companies. During the funding process, a number of the Investor Institutions rejected loans that NMEC chose, obligating NMEC to replace those loans.

Once the loans were purchased and the necessary documents assembled in the escrow account, NMEC issued a Certificate representing ownership of the pool at a formal closing. Each Certificate represented that the holder was the registered owner of a "200/200th fractional undivided interest in a trust which includes as its principal asset a pool (the 'Pool') of conventional single-family mortgage loans...." The trust fund also included any other assets credited to the Certificate account including property acquired by foreclosure and insurance proceeds. Although NMEC contemplated selling fractional interests in the pools, all the Investor Institutions owned a 100 percent undivided interest in their respective pools.

At the closing, the Investor Institutions also signed Pooling and Servicing Agreements ("PSA") that detailed the rights and obligations of NMEC, the servicer (Advance or NMEC), the trustee (Wells Fargo or Bank of America), and the Investor Institutions. The PSA granted the Certifi-

---

2. Plaintiffs claim that the full extent of the solicitation program remains unknown because Feldman and NMEC have invoked the Fifth Amendment during discovery.

3. NMEC executed thirty-three commitment letters between December 1981 and March 1984.

4. The "Investor Institutions" are the 19 savings banks who assigned their claims to the Bank of

America, *NMEC I,* 636 F.Supp. at 1144 & n. 3, and the three Northern District savings bank plaintiffs, *id.* at 1143.

5. Twenty-two of the institutions executed thirty-one Bank of America escrow agreements with NMEC.

cate holder broad access to information about the underlying loans, the right to remove the trustee, and the power to amend the PSA.

For a specified period after each PSA was signed, NMEC had to fix any defective documents and cure all breaches of the representations and warranties. If NMEC could not solve a problem, it had to repurchase the loans. The PSA also contemplated that NMEC would act as a general administrator, overseeing the servicer and trustee. NMEC agreed to make advances to the Certificate holders if any mortgage payments were delinquent, but these payments were entirely voluntary and made at NMEC's sole discretion.[6]

Attachments to the PSA provided the Investor Institution with a record of the addresses of the mortgaged properties in the pool, the names of the mortgagors, the adjusted principal balance of each loan, the interest rate and scheduled monthly payments of principal and interest, and the maturity date of the mortgage note. An exhibit restating the origination standards listed in the commitment letters, and additional "credit underwriting" standards was also attached.

## DISCUSSION

In order for the Certificates to constitute "investment contracts" under the Court's test in *SEC v. Howey*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1945), the transaction must involve "[1] an investment of money [2] in a common enterprise [3] with profits to come solely from the efforts of others." *Id.* at 301, 66 S.Ct. at 1104. Furthermore, "[t]he nature of the instrument is to be determined at the time of issuance, not at some subsequent time." *Danner v. Himmelfarb*, 858 F.2d 515, 520 (9th Cir. 1988), *quoting Great W. Bank & Trust v. Kotz*, 532 F.2d 1252, 1255 (9th Cir.1976).

### A. Investment of Money

■ The Ninth Circuit has formulated a "risk capital" test to aid in analyzing the

investment prong in *Howey*. *Great W. Bank & Trust v. Kotz*, 532 F.2d at 1256–58. "To determine whether the transaction under review involves an 'investment' in return for 'securities' within the meaning of the securities laws, we analyze the nature and degree of risk accompanying the transaction to the party providing the funds." *Id.* at 1256. When distinguishing between a "risky loan" and "risk capital," a court must look beyond the label given to the instrument to the underlying economic reality of the transaction. *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967). Further, in making that determination, the Ninth Circuit examines six non-exclusive factors: 1) the time the money is at risk; 2) the existence of collateral; 3) the form of the obligation; 4) the circumstances of issuance; 5) the relationship between the amount borrowed and the size of the borrower's business; and 6) the contemplated use of the proceeds. No one of these factors is necessarily dispositive. If some of the factors point towards the Certificates being a security, this Court can evaluate the other factors to determine whether the Investor Institutions took steps to protect themselves from any risk which may have been created. *Amfac Mortgage Corp. v. Arizona Mall of Tempe, Inc.*, 583 F.2d 426, 432 (9th Cir.1978).

■ In general, the longer someone controls another person's money, the greater the risk of loss becomes. *Kotz*, 532 F.2d at 1257. Case law does not provide a bright line rule of how much time is necessary to transform a loan into a security. *Compare, e.g., Underhill v. Royal*, 769 F.2d 1426 (9th Cir.1985) (callable notes having maturities of one to three years held to be securities); *with Deauville Sav. & Loan Assn. v. Westwood Sav. & Loan*, 648 F.Supp. 513, 517 (C.D.Cal.1986) (loan and participation interest with ten-year term held not a security because variety of circumstances could lead to shorter term). However, the length of the investment pe-

---

**6.** The "voluntary" nature of this obligation varies from the promise made in the offering letters. In many of those letters the broker repre-

sented that "The issuer [NMEC] intends to pay principal and interest each month whether or not collected."

**502**

riod has significance) only to the extent that the investor's money is "unsecured" during that time. *Amfac,* 583 F.2d at 432–33.

In *Amfac,* the court decided that only a portion of the lender's money was actually at risk for the entire twenty-four month period of the loan because the investment depended upon the progress of construction and the assurances of lease commitments. The lender had exclusive control to cease loan disbursements for a variety of reasons. Moreover, in the event of default, the lender could accelerate under the agreement and demand immediate payment of principal and interest. In light of these factors, the court concluded that the lender's money was not at risk for any substantial length of time. *Id.* at 433.

■ Plaintiffs argue that their funds were at risk for at least five years because although they could call the loans in five years, they could not accelerate payment in the event of default. If, however, the risk is analyzed in light of the collateral and insurance which secured the Certificates, plaintiffs' money should never have been at risk. The funds were either in the possession of the escrow agent or the title companies. Once the mortgages were purchased the funds were fully secured by the underlying properties and backed by guarantees of the originating loan brokers. In addition, the mortgages were bonded by an insurance company for 100% of the principal of the loans. In theory, the Investor Institutions' money was no more at risk than money lent for traditional mortgages.

Plaintiffs raise two arguments in opposition. First, they claim that the collateral underlying the NMEC pools should not be considered because the Investor Institutions could not select or evaluate that collateral. In *Underhill,* 769 F.2d at 1431, the court found the collateral to be of limited significance because the choice of collateral was restricted to notes secured by trust deeds selected exclusively by the promoter. "Thus, the reliability of the underlying security was left to the skill and business judgment of the [promoters]." *Id.*

The Investor Institutions relied upon NMEC to the extent that NMEC employed the appraisers who determined the value of the collateral. In contrast to the plaintiffs in *Underhill,* however, the Investor Institutions had the opportunity to negotiate the origination criteria used to select the collateral. Moreover, the purchasers knew the identity of the collateral property and could review the loan documents in the Trustee's possession.

Second, plaintiffs argue that the Certificates' collateral must be discounted because that collateral was either non-existent or inadequate from the inception. A comparison of NMEC's appraisals of the properties with later appraisals done by independent appraisers retained by plaintiffs lends credence to this contention. Despite this evidence of fraud, however, the Certificates still must be evaluated as they were originally conceived. When they made the investment, the Investor Institutions believed the Certificates were backed by collateral and insurance.

The "circumstances of issuance" also cut against a finding that the Certificates are securities. By its numbers alone, NMEC's targeted solicitation of financial institutions did not rise to the level of other large offerings where courts found the investments to be securities. *See Underhill,* 769 F.2d at 1429 (program advertised by radio, newspapers and brochures); *United States v. Farris,* 614 F.2d 634, 641 (9th Cir.1979) (large offering to many unsophisticated purchasers including widows, widowers, and the elderly), *cert. denied,* 447 U.S. 926, 100 S.Ct. 3022, 65 L.Ed.2d 1120 (1980); *Los Angeles Trust Deed & Mortgage Exch. v. SEC,* 285 F.2d 162, 168 (9th Cir.1960) (brochure and newspaper solicitation resulted in sales to over 9,000 members of general public), *cert. denied,* 366 U.S. 919, 81 S.Ct. 1095, 6 L.Ed.2d 241 (1961).

More important than the numbers of investors involved is the actual nature of the transaction. Unlike uninformed investors swept into an offering made to the general public, the Investor Institutions had full access to all the information they needed to

make informed decisions.[7] Plaintiffs concede that a number of the purchasers reviewed mortgage and loan files and inspected collateral properties; the fact that not every purchaser took advantage of the right to receive information does not transform those purchasers into "passive investors."

Likewise, the Investor Institutions were able to negotiate their purchases to suit their needs. A transaction does not involve a security when "negotiated one-on-one by the parties." *Marine Bank v. Weaver,* 455 U.S. 551, 560, 102 S.Ct. 1220, 1225, 71 L.Ed.2d 409 (1981). *See also Mace Neufeld Prods., Inc. v. Orion,* 860 F.2d 944, 947 (9th Cir.1988) ("... ordinary, individually negotiated private commercial loan transactions" do not involve the purchase or sale of securities).

Turning to the other three *Kotz* factors, the "contemplated use of funds" also suggests that the Investor Institutions were making a risky loan rather than "investing risk capital." The funds went towards the purchase of loans rather than an investment in NMEC as a business venture. Any profit NMEC received was as a broker rather than as a manager. Second, the "relationship of amount borrowed to the size of the borrower's business" factor provides little insight because NMEC was not the borrower—it merely channeled the funds to the mortgagors.

The last *Kotz* factor, the "form of obligation" does provide some support to plaintiffs' position because the majority of the documents used to effectuate the transaction labelled the Certificates as "securities." Although the form of the obligation is not controlling, it could "lead a purchaser justifiably to assume that the federal securities laws apply." *United Housing Found., Inc. v. Forman,* 421 U.S. 837, 850, 95 S.Ct. 2051, 2059–60, 44 L.Ed.2d 621 (1974). Thus, some investors may have been lulled into believing they were purchasing a security. The mortgage pools, however, frequently were referred to as something other than securities. Moreover, many of the references to "securities" were made by laymen. LB & B insists it referred to the Certificates as securities in order to be prudent; this action cannot transform a loan into a security. *See Equitable Life Assurance Soc'y v. Arthur Andersen & Co.,* 655 F.Supp. 1225, 1244 (S.D.N.Y.1987) (inclusion of legend that instruments "have been offered solely for investment and not for resale" did not mean instrument was a security).

Although the Investor Institutions may have believed they were purchasing a security, their access to information and control over negotiations was too great for this belief to require the protection of the securities law. The Investor Institutions

---

**7.** Each Investor Institution signed an Investment Letter at the closing that represented that it:

"1. ... received and reviewed to its satisfaction, and NMEC has given it access to, all such other information concerning NMEC, the Certificate, the Pooling and Servicing Agreement and data concerning the Mortgage loans with respect to which the Certificate has been issued, as the undersigned deems necessary or appropriate to enable the undersigned to evaluate the business and financial merits and risks inherent in the investment in the Certificate, and the undersigned acknowledges that it has received satisfactory and complete information in response to all of its inquiries in respect thereto.

"2. The undersigned acknowledges that NMEC has made available to it the opportunity to obtain additional information to verify the accuracy of the information contained in the Pooling and Servicing Agreement and in all other documents furnished by NMEC to the undersigned in connection with the purchase of the Certificate and to otherwise evaluate the merits and risks of its investment in the Certificate.

"3. The undersigned acknowledges that NMEC has made available to it the opportunity to ask questions of, and receive answers from, NMEC or any person acting on behalf of NMEC concerning the terms and conditions of the Certificate.

"4. The undersigned represents and warrants to NMEC that the undersigned:

"(i) has such knowledge and experience in financial and business matters as to make it capable of evaluating the merits and risks of investment in the Certificate and is able to bear the economic risk of such investment;

"(ii) is acquiring the Certificate for its own account for investment and not with a view to, or for sale in connection with, any distribution thereof; and

"(iii) has no present intention of selling or distributing the Certificate."

purchase of the Certificates did not constitute an investment of money as required by the test in *Howey*. Because that prong of the *Howey* test has not been satisfied, the Court need not look any further. Analysis of the other two prongs, however, further confirms why the Certificates cannot be considered securities.

### B. Common Enterprise

The second prong of the *Howey* test requires a "common enterprise" among the participants of the transaction. 328 U.S. at 301, 66 S.Ct. at 1104.

> A common enterprise is a venture "in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment of third parties." It is not necessary that the funds of investors are pooled; what must be shown is that the fortunes of the investors are linked with those of the promoters, thereby establishing the requisite element of vertical commonality. Thus, a common enterprise exists if a direct correlation has been established between success or failure of [defendants'] efforts and success or failure of the investment.

*SEC v. Goldfield Deep Mines Co.*, 758 F.2d at 463 (citations omitted). The court in *Goldfield* found a direct correlation between the defendants' potential failure and the investors' losses because both were dependent upon the success of the defendants' unique ore processing technique.

In contrast, the success of the Investor Institutions' investment depended solely upon whether the borrowers on the underlying mortgages met their obligations to repay the loans. The success or failure of NMEC, and the success or failure of any particular mortgage pool, had no connection. In fact, a number of key officers at the Investor Institutions conceded that if NMEC went bankrupt, the mortgage pools would not lose value. Conversely, NMEC could prosper while the value of the properties in an individual pool declined or was destroyed by adverse developments, such a fluctuations in the real estate market. *See Brodt v. Bache & Co.*, 595 F.2d 459, 461

(9th Cir.1978) (success or failure of the brokerage house did not correlate with the individual investor's profit or loss).

Thus, the present case can be distinguished from *United States v. Carman*, 577 F.2d 556 (9th Cir.1978). In *Carman*, the court held that the sale of federally insured student loan packages by a trade school to a credit union involved a common enterprise. Although the loans were guaranteed by the federal government and carried a fixed return, a risk of loss existed because the package included a repurchase clause and a guarantee that the school would cover any refund liability accruing from students who did not complete the programs. Because the investors faced a substantial risk of loss if the trade school failed, they were engaged in a common enterprise with the school. In contrast, NMEC's repurchase clause covered a limited time period, and applied only in specified situations. Moreover, NMEC never *guaranteed* that it would advance funds on delinquent loans, but only made non-enforceable promises.

### C. Entrepreneurial Efforts of Others

■ The third prong of the *Howey* test requires that the investment in a common venture be "premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *Forman*, 421 U.S. at 852, 95 S.Ct. at 2060. The Ninth Circuit has interpreted "entrepreneurial efforts" to mean "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *SEC v. Glenn W. Turner Enter., Inc.*, 474 F.2d 476 (9th Cir.), *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). Thus, the investor might be involved to some degree in the managing of his investment, but if the manager or promoter's efforts are those which make or break the investment, then the interest may be considered a security. *Matek*, 862 F.2d at 725.

Plaintiffs claim they relied on NMEC's (and Feldman's) skill prior to the closing to choose the loans because the origination

standards granted NMEC some discretion as to which loans to select. Thus, their expectation of return depended upon NMEC's ability to choose "good" loans, *i.e.*, loans that would not go into default, and backed by adequate collateral. Plaintiffs' argument carries little weight, however, because they negotiated those origination standards and had the right to reject any loans that did not conform to those standards. These rights of control and discretion cannot be equated with reliance upon another's skill.

Once the mortgage pools were in place, plaintiffs' claim they relied upon NMEC, the servicer and the trustee to perform managerial duties that directly affected the return of profits. As discussed above, none of NMEC's duties directly affected the profitability of the mortgage pools. Similarly, the servicer and the trustee performed merely administrative duties that "do not constitute the managerial or entrepreneurial efforts of others." *First Fin. Fed. Sav. & Loan v. E.F. Hutton Mortg.*, 834 F.2d 685, 689 (8th Cir.1987). *See also, Union Planters Nat'l Bank v. Commercial Credit Business Loans, Inc.*, 651 F.2d 1174, 1185 (6th Cir.) (responsibility of lead lender in loan participation to service and administer loans not managerial or entrepreneurial), *cert. denied,* 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981); *In re EPIC Mortg. Ins. Litig.*, 701 F.Supp. 1192 (E.D.Va.1988) (mortgage banker that grouped loans into pools and sold certificates of participation to lending institutions, and later serviced the loans, did not perform entrepreneurial or managerial functions).

### D. *The* Securities Industries *Case*

Finally, plaintiffs rely heavily upon *Securities Indus. Ass'n v. Clarke*, 703 F.Supp. 256 (S.D.N.Y.1988), to support their position that the Certificates should be considered securities. That reliance is misplaced. In *Securities Indus.*, the court faced the question of whether the sale by a bank of shares of private, mortgage-backed, pass-through certificates constitut-

ed a sale of the bank's assets or was an offering of securities prohibited by the national banking laws and the Glass–Steagall Act. The court held that once the bank placed the assets in a trust without recourse it was no longer selling its own assets, but was engaged in the sale of interests in a separate entity, which constituted the underwriting of a security in violation of the Glass–Steagall Act.

Although the court in *Securities Indus.* based its analysis on the Supreme Court's three-part test in determining that the certificates were securities, those certificates are easily distinguishable from the NMEC Certificates. Unlike the Certificates sold by NMEC, the bank in *Securities Indus.* offered its certificates through a public offering, registered with the Securities Exchange Commission, and partially underwritten a major investment bank. The court stressed that the public needed the full disclosure offered by the securities laws in order to prevent banks from relegating problem mortgages to the certificate trusts. *Id.* at 261.[8]

### CONCLUSION

Because the NMEC Certificates are not "securities," defendants' motions for summary judgment on all securities-based claims of plaintiffs are granted.

---

**8.** Although it quoted the Supreme Court's three-part test in *United Housing Found.*, 421 U.S. at 852, 95 S.Ct. at 2060–61, *Securities Indus.*, does

not address the issue of whether the "profits" derived were from the managerial or entrepreneurial efforts of *others.* 703 F.Supp. at 260.