SECURITIES INDUSTRY ASSOCIATION, Plaintiff–Appellee,

v.

Robert L. CLARKE and Office of the Comptroller of the Currency, Defendants–Appellants,

v.

SECURITY PACIFIC NATIONAL BANK,
Intervenor–Defendant–Appellant.

Nos. 1124, 1125, Dockets 89–6027, 89–6029.

United States Court of Appeals, Second Circuit.

Argued May 23, 1989.
Decided Sept. 8, 1989.

Helen M. Toor, Asst. U.S. Atty., S.D. New York, New York City (Benito Romano, U.S. Atty. S.D. New York, Steven E. Obus, Asst. U.S. Atty., S.D. New York, New York City, L. Robert Griffin, Rosa M. Koppel, Office of the Comptroller of the Currency, Washington, D.C., of counsel), for appellants Robert L. Clarke and Office of the Comptroller of the Currency.

Kenneth L. Bachman, Jr., Washington, D.C. (Matthew D. Slater, Cleary, Gottlieb, Steen & Hamilton, Washington, D.C., Robert L. Tortoriello, Richard F. Ziegler, Cleary, Gottlieb, Steen & Hamilton, New York City, Russell A. Freeman, Maurice K. DeWolff, Dan C. Aardal, Security Pacific National Bank, Los Angeles, Cal., of counsel), for intervenor-appellant Security Pacific Nat. Bank.

James B. Weidner, New York City (David A. Schulz, Mark Holland, R. Scott Henderson, Rogers & Wells, New York City, William J. Fitzpatrick, Securities Industry Ass'n, New York City, Donald J. Crawford, Securities Industry Ass'n, Washington, D.C., of counsel), for appellee Securities Industry Ass'n.

Lewis B. Kaden, Edward J. Kelly, III, Jeffrey D. Berman, Davis Polk & Wardwell, New York City, for amicus curiae New York Clearing House Ass'n.

John J. Gill, Gen. Counsel, Michael F. Crotty, Associate Gen. Counsel, American Bankers Ass'n, Washington, D.C., for amicus curiae American Bankers Ass'n.

Michael S. Helfer, Christopher R. Lipsett, Wilmer, Cutler & Pickering, Washington, D.C., for amicus curiae Bank Capital Markets Ass'n.

Before VAN GRAAFEILAND, MESKILL and WINTER, Circuit Judges.

MESKILL, Circuit Judge:

Plaintiff-appellee Securities Industry Association (SIA) brought the instant action in the United States District Court for the Southern District of New York, Duffy, J. SIA's suit challenged a decision of Robert L. Clarke, the Comptroller of the Currency (the Comptroller). The Comptroller determined that the sale of mortgage pass-through certificates by intervenor-defendant-appellant Security Pacific National Bank (SPN Bank) was not in violation of those sections of the Banking Act of 1933, ch. 89, Pub.L. No. 73–66, 48 Stat. 162 (1933) (codified as amended in scattered sections of 12 U.S.C.), commonly referred to as the Glass–Steagall Act. *See Securities Industry Ass'n v. Board of Governors*, 839 F.2d 47, 54–56 (2d Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 2830, 100 L.Ed.2d 931 (1988) (*Citicorp*). The district court granted SIA's Fed.R.Civ.P. 56 motion for summary judgment, rejecting the statutory analysis of the Comptroller's decision. *Securities Industry Ass'n v. Clarke*, 703 F.Supp. 256 (S.D.N.Y.1988).

We vacate the judgment of the district court and remand with instructions to dismiss the complaint.

## BACKGROUND

### A. *Mortgage Pass–Through Certificates*

Mortgage pass-through certificates are used by banks as a mechanism for selling mortgage loans. A number of mortgage loans previously originated by a bank are placed in a pool. The bank then transfers the pool to a trust. In exchange for the pool, the trustee transfers to the bank pass-through certificates. These certificates represent fractional undivided interests in the pool of mortgage loans. The certificates may then be sold publicly or privately.

After sale of the certificates, the mortgage loans are often serviced by the originator-bank. In such a case, the bank collects the loan payments and "passes through" the principal and interest on a pro rata basis to the certificate holders. In doing so, the bank may deduct service or other fees.

Use of this mechanism has important benefits for banks, benefits that have resulted in its increasing popularity and use. Because residential mortgage loans typically are of long duration, banks traditionally have bought and sold the loans to facilitate management of their assets and liabilities. Use of the pass-through certificate mechanism makes the sale of these loans easier. Individual loans do not have to be sold separately, and buyers may find it more efficient and less risky to purchase interests in a pool of mortgages instead of single mortgages.

### B. *The January 23, 1987 Offering of SPN Bank*

A Prospectus and Prospectus Supplement dated January 23, 1987 described the offering of approximately $194 million of Security Pacific Mortgage Pass–Through Certificates, Series 1987–B.

The Prospectus provided for the creation of a pool consisting of conventional, fixed-rate residential mortgage loans. "Each Mortgage Loan [would] be selected by [SPN Bank] for inclusion in the Mortgage Pool from among those originated by [SPN Bank] in the ordinary course of [SPN Bank's] lending activities as carried on in its offices in California." Certain characteristics of the mortgages to be selected were specified.

The Prospectus provided that, at the time of issuance of the series, "[SPN Bank] will assign the Mortgage Loans in the Mortgage Pool evidenced by that series to the Trustee.... The Trustee will, concurrently with such assignment, authenticate and deliver Certificates evidencing such series to [SPN Bank] in exchange for the Mortgage Loans." The freely transferable certificates would represent fractional undivided interests in the Trust Fund.

Limited credit support for the issue was to be provided either by (1) an irrevocable letter of credit issued by SPN Bank, (2) a limited guaranty issued by an entity other than SPN Bank, or (3) third-party mortgage insurance purchased by SPN Bank in

its role as servicer of the mortgage loans. If SPN Bank provided its own letter of credit, the coverage was to be no more than ten percent of the initial aggregate principal balance of the mortgage pool. Any risk of delinquency or default not covered by these mechanisms of credit support would be borne by the certificate holders.

The Prospectus provided for distribution of the certificates by any of three methods: "1. By negotiated firm commitment underwriting and public reoffering by underwriters; 2. By placements by [SPN Bank] with institutional investors through agents; and 3. By direct placements by [SPN Bank] with institutional investors."

After the sale of the certificates, SPN Bank was to continue to service the mortgage loans on behalf of the certificate holders for a contractually specified fee. As part of its ongoing responsibilities, SPN Bank would "monthly distribute[ ] to certificate holders the payments received from the mortgagors (net of its servicing fee) based on their pro rata interest in the mortgage loans."

The Prospectus Supplement for Series 1987–B described various characteristics of the mortgages selected for inclusion in the pool for that particular issue. The Supplement also specified that the trustee was to be Union Bank, a California bank. Credit support was to be provided by SPN Bank's parent, Security Pacific Corporation, in the form of a limited guaranty of no more than ten percent of the aggregate principal balance of the mortgage loans. With respect to distribution of this issue, the Supplement provided, in pertinent part:

> Subject to the terms and conditions of [an] Underwriting Agreement ... among [SPN Bank, its parent Security Pacific Corporation and Kidder, Peabody & Co., Inc.], under which [SPN Bank] and Kidder Peabody ... will act as [the U]nderwriters ..., the Certificates are being purchased from [SPN Bank] by the Underwriters upon issuance. Distribution

of the Certificates is being made by the Underwriters from time to time in negotiated transactions or otherwise at varying prices to be determined at the time of sale.

On February 23, 1987, the sale of certificates for Series 1987–B closed and the certificates were delivered to their purchasers.

### C. SIA's Challenge to SPN Bank's Offering

SIA is a national trade association. According to its complaint, its members include "over 500 organizations responsible for more than 90 percent of the securities brokerage and investment banking business of the nation." Its members are in the businesses of "retail and institutional securities brokerage, investment advisory services, securities trading and market making, underwriting and other investment banking functions and related activities." In an April 2, 1987 letter, SIA wrote to the Comptroller, expressing its "concern" about SPN Bank's Prospectus and Prospectus Supplement for the Series 1987–B issue of mortgage pass-through certificates.[1] SIA stated its belief that SPN Bank's participation in the transaction constituted a violation of the Glass–Steagall Act. The letter asked the Comptroller to review the transaction and "declare the bank's involvement in it to be contrary to the Glass–Steagall Act."

The Comptroller responded to SIA's request by issuing a twenty page letter dated June 16, 1987. Letter from Robert L. Clarke to Russell A. Freeman, O.C.C. Interpretive Letter No. 388, Fed.Banking L.Rep. (CCH) ¶ 85,612, 6 O.C.C. Qtrly.J. No. 4, at 41. The letter was addressed directly to SPN Bank because, as the Comptroller explained, the Office of the Comptroller of the Currency (OCC) "is the primary regulator of [SPN] Bank's activities." A copy of the letter was sent to SIA. The Comptroller found that SPN Bank's offering did

---

**1.** It was the Prospectus and Prospectus Supplement for Series 1987–B which accompanied SIA's letter to the Comptroller. The record also includes Prospectuses and Prospectus Supplements for three other issues by SPN Bank, Series 1987–A, dated January 23, 1987 and valued at $116 million, Series 1987–C, dated March 20, 1987 and valued at $35 million, and Series 1987–D, dated March 20, 1987 and valued at $270 million.

not violate the Glass–Steagall Act. The Comptroller concluded that

the Bank's program, as described in the Prospectus and Prospectus Supplement dated January 23, 1987, is squarely based on long-standing precedent that is fully supported by applicable law and subsequent court decisions interpreting these laws. In pooling its mortgage loans and selling interests therein, the Bank is merely engaging in a permitted sale of its mortgage assets. We cannot conclude that the Glass–Steagall Act is intended to preclude banks from conducting this activity.

Unsatisfied with this result, SIA filed a complaint against the Comptroller and the OCC in the United States District Court for the Southern District of New York. SIA sought declaratory and injunctive relief. The complaint claimed that the Comptroller's ruling was "arbitrary, capricious, an abuse of discretion, in excess of his statutory authority and otherwise not in accordance with the law, and that it is, therefore, null and void." SIA asked that the Comptroller be ordered to withdraw his ruling and refrain from approving the requests of banks to engage in similar activity. SIA also asked the court to enjoin the Comptroller "from continuing in effect any other such approvals that may have been granted by the Comptroller."

Pursuant to a stipulation between the parties, the district court ordered the intervention of SPN Bank under Fed.R.Civ.P. 24. The Comptroller and the OCC moved for dismissal of the complaint under Fed.R. Civ.P. 8(c) and 12(b)(1), or, in the alternative, for summary judgment under Fed.R. Civ.P. 56. SPN Bank moved for dismissal under Fed.R.Civ.P. 12(b)(1) or, in the alternative, for summary judgment. SIA cross-moved for summary judgment.

The district court, in a December 19, 1988 Memorandum and Order, granted the summary judgment motion of SIA, rejecting the statutory analysis of the Comptroller's decision. *Securities Industry Ass'n v. Clarke*, 703 F.Supp. 256 (S.D.N.Y.1988). In a final judgment filed January 4, 1989, the court "ORDERED, ADJUDGED AND DECREED that the bank activities described in the Court's December 19, 1988 Memorandum and Order violate[d] federal law, and the June 16, 1987 ruling of the Comptroller of the Currency approving of such activities is contrary to law, null, void and of no legal force or effect."

The Comptroller, the OCC and SPN Bank appeal from the final judgment of the district court. We vacate the judgment of the district court and remand with instructions to dismiss the complaint.

## DISCUSSION

### A. *Preliminary Matters*

The Comptroller and SPN Bank both argue that SIA lacks standing to bring this action. The Comptroller also argues that SIA's action should be barred by the equitable doctrine of laches. These arguments were raised below, but the district court did not address them. We reject both arguments and hold that SIA has standing and that the action was timely brought.

### 1. *Standing*

■ SIA asserts that both it "and its members are directly interested and aggrieved parties entitled to review and challenge this action of the Comptroller." In *Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987) (*Clarke*), the Supreme Court upheld SIA's standing to challenge decisions of the Comptroller to approve "the applications of two national banks for the establishment or purchase of discount brokerage subsidiaries." *Id.* at 390, 107 S.Ct. at 752–53.[2] Af-

---

**2.** There was no discussion in *Clarke* specifically addressing whether SIA's standing was based on individual standing or associational standing. *Cf. Pennell v. Tri–County Apartment House Owners Ass'n*, 485 U.S. 1, ——, 108 S.Ct. 849, 854, 99 L.Ed.2d 1 (1988); *Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975).

Here, SIA asserts injury both to itself and to its members. Appellants make no arguments with respect to the distinct requirements for associational standing, *see Pennell*, 485 U.S. at —— & n. 3, 108 S.Ct. at 855 n. 3. We see no reason for distinguishing *Clarke* on such a basis.

ter an analysis of standing requirements and the governing banking laws, the Court concluded that

> competitors who allege an injury that implicates the policies of the National Bank Act are very reasonable candidates to seek review of the Comptroller's rulings. There is sound reason to infer that Congress "intended [SIA's] class [of plaintiffs] to be relied upon to challenge agency disregard of the law." [*Block v.*] *Community Nutrition Institute*, 467 U.S. [340, 347, 104 S.Ct. 2450, 2454, 81 L.Ed.2d 270 (1984)]. And we see no indications of the kind presented in *Community Nutrition Institute* that make "fairly discernible" a congressional intent to preclude review at [SIA's] behest. We conclude, therefore, that [SIA] was a proper party to bring this lawsuit.

*Id.* 479 U.S. at 403, 107 S.Ct. at 759. We find the same to be the case here.

The statutory basis for SIA's standing is section 10 of the Administrative Procedure Act, 5 U.S.C. § 702 (1982). That section "grants standing to a person 'aggrieved by agency action within the meaning of a relevant statute.'" *Association of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970) (*Data Processing*) (quoting 5 U.S.C. § 702); *see also Clarke*, 479 U.S. at 394, 107 S.Ct. at 754. The Supreme Court has indicated that section 702 requires not only "that the complainant be 'adversely affected or aggrieved,' *i.e.*, injured in fact," *Clarke*, 479 U.S. at 395, 107 S.Ct. at 755 (quoting 5 U.S.C. § 702), but also that "'the interest sought to be protected by the complainant [be] arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Id.* at 396, 107 S.Ct. at 755 (quoting *Data Processing*, 397 U.S. at 153, 90 S.Ct. at 830). The "zone of interests" test "is most usefully understood as a gloss on the meaning of § 702." *Id.* at 400 n. 16, 107 S.Ct. at 758 n. 16. The crux of

SIA's complaint in this case is that the Comptroller's ruling permits national banks such as SPN Bank to sell mortgage pass-through certificates, an activity SIA alleges is illegal under the Glass–Steagall Act. SIA claims that the Comptroller's ruling will "subject SIA's members to unlawful competition, will deprive them of legitimate business, and will dilute, divert and withdraw a portion of the market pertaining to the underwriting of various securities."

As discussed *infra*, a major purpose of the Glass–Steagall Act was to draw a line between commercial and investment banking, with national banks prohibited from participating in investment banking. *See Securities Industry Ass'n v. Board of Governors*, 468 U.S. 137, 144–48, 104 S.Ct. 2979, 2983–85, 82 L.Ed.2d 107 (1984) (*Bankers Trust I*); *Investment Co. Inst. v. Camp*, 401 U.S. 617, 629, 91 S.Ct. 1091, 1098, 28 L.Ed.2d 367 (1971) (*Camp*); *Citicorp*, 839 F.2d at 54–56. The Comptroller's decision has the effects of permitting and encouraging national banks to issue mortgage pass-through certificates. *See infra*. SIA's complaint is that such activity constitutes investment banking. SIA, representing participants in the field of investment banking, seeks by this action to prevent competition with its members in that field. *Cf. Investment Co. Inst. v. Conover*, 790 F.2d 925, 926 (D.C.Cir.), *cert. denied*, 479 U.S. 939, 107 S.Ct. 421, 93 L.Ed.2d 372 (1986) (*Conover*). We find it at least "arguable" that the competition SIA seeks to prevent by this action is that legislated against by Congress, and we therefore conclude that SIA's interests are within the zone of interests protected by the Glass–Steagall Act. *See Clarke*, 479 U.S. at 394–403, 107 S.Ct. at 754–59; *Camp*, 401 U.S. at 620–21, 91 S.Ct. at 1093–94; *Arnold Tours, Inc. v. Camp*, 400 U.S. 45, 46, 91 S.Ct. 158, 159, 27 L.Ed.2d 179 (1970) (per curiam); *Data Processing*, 397 U.S. at 156, 90 S.Ct. at 831.[3] We thus hold that the

---

**3.** That Congress' primary concern may have been to protect banks and not investment bankers is not determinative on this issue. Discussing this point, the Supreme Court said of *Camp*, "it was enough to provide standing that Congress, for its own reasons, primarily its concern for the soundness of the banking system, had forbidden banks to compete with plaintiffs by entering the investment company business."

zone of interests standing requirement is satisfied here.

Appellants raise lack of standing as a constitutional objection to SIA's right to bring this action.

Although standing in its outer dimensions is a prudential concept to be shaped by the decisions of the courts as a matter of sound judicial policy and subject to the control of Congress, at its core it becomes a constitutional question; for standing in its most basic aspect can be one of the controlling elements in the definition of a case or controversy under Article III.

*ASARCO Inc. v. Kadish*, — U.S. —, —, 109 S.Ct. 2037, 2043, 104 L.Ed.2d 696 (1989). As a constitutional matter, appellants argue that the requirements of causation and redressability are not satisfied here. *See generally* L. Tribe, *American Constitutional Law* § 3–18 (2d ed.1988). That is, they maintain that SIA's alleged injury "can[not] be traced to the challenged action of the [Comptroller]," *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 41, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976), and that SIA "has [not] shown an injury to [it]self that is likely to be redressed by a favorable decision," *id.* at 38, 96 S.Ct. at 1924.

In focusing on these constitutional concerns, appellants seek to distinguish *Data Processing*, 397 U.S. 150, 90 S.Ct. 827, *Camp*, 401 U.S. 617, 91 S.Ct. 1091, and *Clarke*, 479 U.S. 388, 107 S.Ct. 750. The Comptroller argues that in those cases it was significant that the challenged decision of the Comptroller occurred before the banks' activities and that the banks' activities could not have occurred prior to the Comptroller's approval. He maintains that in this case, on the other hand, various banks have issued mortgage pass-through certificates in the past, and that, indeed the particular issue underlying the Comptrol-

ler's June 16, 1987 decision, SPN Bank's Series 1987–B, occurred before the Comptroller made his decision. The Comptroller concludes that any injury to SIA or its members is therefore not causally linked to that decision. We reject this argument and conclude that SIA's alleged competitive injury is sufficiently linked to the Comptroller's decision to satisfy constitutional standing requirements.

In arguing that any competitive injury suffered by SIA could not have resulted from a ruling of the Comptroller subsequent to those transactions, appellants portray SIA's suit as if it is an attack merely on *past* marketing of mortgage pass-through certificates by banks. But SIA's primary concern here is not with past lost competition.[4] Rather, SIA's purpose is manifest: it fears future competition that will be permitted and encouraged by the Comptroller's interpretation of the applicable law, as reflected in the June 16 decision at issue here. *Cf. Conover*, 790 F.2d at 926 (recognizing implications for banking and securities industries in considering action for declaratory and injunctive relief challenging Comptroller's decision that Citibank's marketing of individual retirement accounts did not violate Glass–Steagall Act).

Appellants' argument ignores the future effects of the Comptroller's ruling approving SPN Bank's use of mortgage pass-through certificates. *Cf. id.* "The Comptroller ... is charged by the national banking laws with the execution of all laws of the United States relating to the organization, operation, regulation and supervision of national banks and in particular with the execution of 12 U.S.C. [§] 24 which sets forth the corporate powers of national banks." 12 C.F.R. § 1.1 (1989); *see also* 12 U.S.C. § 1 (1982). Decisions issued by the Comptroller pursuant to his regulatory authority have consequences beyond the par-

---

*Clarke*, 479 U.S. at 398, 107 S.Ct. at 757; *see also Arnold Tours*, 400 U.S. at 46, 91 S.Ct. at 159.

**4.** It is true that SIA's complaint asked the district court, *inter alia*, to enjoin the Comptroller "from continuing in effect any other such approvals that may have been granted by the

Comptroller." Nevertheless, in its brief, SIA states "[t]he [Comptroller's brief] refers to billions of dollars of mortgage-backed securities sold by banks in the past ..., but SIA's contentions neither concern those transactions nor seek to undo them."

ticular facts at hand. The Supreme Court implicitly recognized this in *Camp*, 401 U.S. at 624, 91 S.Ct. at 1095. There, the Court found that an association of investment companies had standing to bring a suit based on future competitive injury where the association challenged not only regulations issued by the Comptroller but also a decision by the Comptroller to approve the plan of First National Bank of New York to offer collective investment services. In so doing, the Court noted that the plan approved by the Comptroller was "expected, the briefs tell us, to be a model for other banks which decide to offer their customers a collective investment service." *Id.* at 622, 91 S.Ct. at 1094. The same would seem to be the case here. The decision by the Comptroller, issued under his statutory authority, is, in effect, a "green light" for other national banks to enter the mortgage pass-through certificate market with programs similar to that used by SPN Bank and specifically approved by the Comptroller. That analogous programs have been approved in the past does not diminish the significance of this particular decision. SIA has provided indications that the Comptroller's ruling, until it was reversed by the district court, did in fact have the effect of encouraging this type of activity. In light of the important role the Comptroller plays in regulating the behavior of national banks, this response is not surprising. In sum, we find that this is not a case where "[t]he links in the chain of causation between the challenged Government conduct and the asserted injury are far too weak for the chain as a whole to sustain [SIA's] standing." *Allen v. Wright*, 468 U.S. 737, 759, 104 S.Ct. 3315, 3328, 82 L.Ed.2d 556 (1984); *see also Simon*, 426 U.S. at 40–46, 96 S.Ct. at 1925–28.

Indeed, we think it is somewhat curious that the Comptroller bases his standing argument in part on the position that his own decision will have no causal connection to national banks' increased use of mortgage pass-through certificates in the future and therefore to the competitive injury SIA alleges it will suffer thereby. Such minimizing of the importance and impact of his own decisions is particularly anomalous in light of his arguments on the issue of laches (many banks have relied on his earlier rulings approving similar programs) and on the merits (his earlier rulings have precedential force).

We thus reject the argument that the Comptroller's decision is not sufficiently causally linked to SIA's alleged injury to support SIA's standing. We also reject appellants' related argument that SIA's injury "is [not] likely to be redressed by a favorable decision." *Simon*, 426 U.S. at 38, 96 S.Ct. at 1924; *see also ASARCO*, —— U.S. at ——, 109 S.Ct. at 2042. The Comptroller's decision will have the effect of permitting and encouraging national banks to market mortgage pass-through certificates. By its action for declaratory and injunctive relief, SIA seeks a judicial determination that the Comptroller was wrong, *i.e.*, that national banks violate federal law when they market mortgage pass-through certificates as SPN Bank has done. The "likely effect," *see Von Aulock v. Smith*, 720 F.2d 176, 181 (D.C.Cir.1983), of such a determination would be to prevent the competitive injury that SIA alleges it will suffer in the future as a result of the Comptroller's decision.

### 2. Laches

■ The Comptroller seeks to invoke the doctrine of laches, suggesting that "equitable considerations dictate denial of injunctive relief in this action." *New Era Publications Int'l v. Henry Holt & Co.*, 873 F.2d 576, 584 (2d Cir.1989). We reject the contention that prejudice resulted from "unreasonable and inexcusable delay" by SIA in bringing this action. *See id.*

The Comptroller points to his approval of "programs closely resembling the mortgage-backed pass-through certificate programs of Security Pacific" over the course of the past ten years. SIA has been aware of these transactions, and its members have even participated in them, but SIA has not previously challenged their legality. Apparently unpersuaded by his own argument concerning traceability for purposes of standing, *see supra*, the Comptroller

seeks to demonstrate prejudice by contending that national banks have relied on these earlier, unchallenged approvals of the programs and have thereby "expend[ed] financial and human resources to establish such programs."

As we have already noted, however, SIA's main concern is to prevent future competition that will be encouraged by the Comptroller's decision permitting the SPN Bank program. Its aim is not to disrupt expectations formed by analogous pass-through certificate transactions that have occurred in the past. As SIA concedes in its brief, "[t]he [Comptroller] refers to billions of dollars of mortgage-backed securities sold by banks in the past ..., but SIA's contentions neither concern those transactions nor seek to undo them." On that basis, we find the doctrine of laches to be inapplicable.

### B. *The Standard of Review*

■ The issue in this case is the validity of a decision by the Comptroller that SPN Bank's sale of mortgage pass-through certificates was not violative of the Glass–Steagall Act. In assessing the Comptroller's performance of his duties, we must keep in mind the rather explicit guidance from the Supreme Court.

> [W]e cannot come lightly to the conclusion that the Comptroller has authorized activity that violates the banking laws. It is settled that courts should give great weight to any reasonable construction of a regulatory statute adopted by the agency charged with the enforcement of that statute. The Comptroller of the Currency is charged with the enforcement of the banking laws to an extent that warrants the invocation of this principle with respect to his deliberative conclusions as to the meaning of these laws.

*Camp,* 401 U.S. at 626–27, 91 S.Ct. at 1097; *see Clarke,* 479 U.S. at 403–04, 107 S.Ct. at 759–60; *Conover,* 790 F.2d at 932 (noting that the Supreme Court's "declination to defer to the Comptroller" in *Camp* was "occasioned ... by the Comptroller's complete silence as to the meaning of the governing statute"); *cf. Securities Industry Ass'n v. Board of Governors,* 468 U.S. 207, 217 & n. 16, 104 S.Ct. 3003, 3009 & n. 16, 82 L.Ed.2d 158 (1984) (*Schwab*); *Board of Governors v. Investment Co. Inst.,* 450 U.S. 46, 68, 101 S.Ct. 973, 988, 67 L.Ed.2d 36 (1981) (*ICI*). On the other hand, this "deference is not to be a device that emasculates the significance of judicial review. Judicial deference to an agency's interpretation of a statute 'only sets "the framework for judicial analysis; it does not displace it." ' " *Bankers Trust I,* 468 U.S. at 142–43, 104 S.Ct. at 2982 (quoting *United States v. Vogel Fertilizer Co.,* 455 U.S. 16, 24, 102 S.Ct. 821, 827, 70 L.Ed.2d 792 (1982) (in turn quoting *United States v. Cartwright,* 411 U.S. 546, 550, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973))).

With these principles of deferential review in mind, we turn first to the statute at issue here, and then to the question whether the Comptroller's construction of it was reasonable.

### C. *The Glass–Steagall Act*

"Demand for divorcing banking and securities activities followed in the wake of the stock market crash of 1929." *Citicorp,* 839 F.2d at 49. Desiring to protect bank depositors after widespread bank closings, Congress enacted the Glass–Steagall Act. *See ICI,* 450 U.S. at 61, 101 S.Ct. at 984. "The Act responded to the opinion, widely expressed at the time, that much of the financial difficulty experienced by banks could be traced to their involvement in investment-banking activities both directly and through security affiliates." *Bankers Trust I,* 468 U.S. at 144, 104 S.Ct. at 2983. As the Supreme Court has explained, Congress endeavored to eliminate not only the obvious hazards associated with banks' participation in the inherently risky securities business, but also the "subtle hazards" arising from participation in both banking and investment activity. *See id.* at 145–47, 104 S.Ct. at 2983–85; *Camp,* 401 U.S. at 630–34, 91 S.Ct. at 1098–99.

By responding to the problem by means of the Glass–Steagall Act, Congress decided upon a "broad structural approach." *See Bankers Trust I,* 468 U.S. at 147, 104

S.Ct. at 2984. "Through flat prohibitions, the Act sought to 'separat[e] as completely as possible commercial from investment banking.'" *Id.* (quoting *ICI*, 450 U.S. at 70, 101 S.Ct. at 989).

"Sections 16 and 21 of the Act are the principal provisions that demarcate the line separating commercial and investment banking." *Id.* at 148, 104 S.Ct. at 2985; *see also Citicorp*, 839 F.2d at 54 (describing §§ 16, 20, 21 and 32 as the "'Maginot Line' of the financial world") (citations omitted). The Supreme Court has indicated that sections 16 and 21 "seek to draw the same line." *Bankers Trust I*, 468 U.S. at 149, 104 S.Ct. at 2985; *see also Citicorp*, 839 F.2d at 55.

Section 16 of the Act, 12 U.S.C. § 24 (Seventh) (1982 & Supp. V 1987), draws the line from the perspective of the commercial bank. Under section 16

> [a national banking association ... shall have power ... t]o exercise by its board of directors or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes according to the provisions of title 62 of the Revised Statutes.

12 U.S.C. § 24 (Seventh). The section also contains the following limitation of a bank's powers:

> The business of dealing in securities and stock by the association shall be limited to purchasing and selling such securities and stock without recourse, solely upon the order, and for the account of, customers, and in no case for its own account, and the association shall not underwrite any issue of securities or stock.

*Id.*

"Section 21 also separates investment and commercial banks, but does so from the perspective of investment banks." *Bankers Trust I*, 468 U.S. at 148, 104 S.Ct. at 2985. Section 21 provides, in pertinent part, that it is unlawful

> [f]or any person, firm, corporation, association, business trust, or other similar organization, engaged in the business of issuing, underwriting, selling, or distributing, at wholesale or retail, or through syndicate participation, stocks, bonds, debentures, notes, or other securities, to engage at the same time to any extent whatever in the business of receiving deposits subject to check or to repayment upon presentation of a passbook, certificate of deposit, or other evidence of debt, or upon request of the depositor.

12 U.S.C. § 378(a)(1) (1982). The section, in pertinent part, qualifies these restrictions:

> *Provided,* That the provisions of this paragraph shall not prohibit national banks ... from dealing in, underwriting, purchasing, and selling investment securities, or issuing securities, to the extent permitted to national banking associations by the provisions of section 24 of this title: *Provided further,* That nothing in this paragraph shall be construed as affecting in any way such right as any bank, banking association, savings bank, trust company, or other banking institution, may otherwise possess to sell, without recourse or agreement to repurchase, obligations evidencing loans on real estate.

*Id.*

In addition to these "line-drawing" sections of the Glass–Steagall Act, also of importance here is 12 U.S.C. § 371(a) (1982), which was amended by the Garn–St Germain Depository Institutions Act of 1982, Pub.L. No. 97–320, Title IV, § 403(a), 96 Stat. 1469, 1510, to provide that "[a]ny national banking association may make, arrange, purchase or sell loans or extensions of credit secured by liens on interests in real estate, subject to such terms, conditions, and limitations as may be prescribed by the Comptroller of the Currency by order, rule, or regulation."

### D. *The Comptroller's Decision*

As it is the decision of the Comptroller that is at issue here, we review that decision in some detail.

### 1. *Sale of Mortgages Is Permitted*

In considering the legality of the SPN Bank transaction under federal banking laws, the Comptroller began his analysis by examining the national bank's authority to sell its mortgage loans generally. In concluding that national banks have such authority, the Comptroller relied on three bases. First, since the enactment of the National Bank Act in 1864, national banks have had the express power to "carry on the business of banking ... by ... negotiating promissory notes ... and other evidences of debt." 12 U.S.C. § 24 (Seventh). Second, the Supreme Court long ago concluded that the sale of mortgages is within the incidental powers of national banks. *See First National Bank v. City of Hartford*, 273 U.S. 548, 560, 47 S.Ct. 462, 466, 71 L.Ed. 767 (1927). Finally, under 12 U.S.C. § 371(a), national banks are permitted to "make, arrange, purchase or sell loans or extensions of credit secured by liens on interests in real estate." The Comptroller concluded that "it is clearly established that national banks may sell their mortgage assets under the express authority of 12 U.S.C. §§ 24 (Seventh) and 371(a)."

### 2. *Use of the Pass–Through Certificate Mechanism To Sell Mortgages Is Either an Express or an Incidental Banking Power*

Having determined that SPN Bank had the express power to sell its mortgage loans, the Comptroller concluded "[t]he fact that the negotiation and sale may be accomplished through the creation and sale by a bank of participation certificates, an activity which [the OCC] long has approved, does not alter in any respect the substance of the transaction, nor its permissibility under the national banking laws."

The Comptroller justified permitting use of the pass-through certificate mechanism on two grounds. First, he considered use of the mechanism as simply a new way of performing the old job of selling bank assets. He cited the Ninth Circuit's admonition that "the powers of national banks must be construed so as to permit the use of new ways of conducting the very old business of banking." *M & M Leasing Corp. v. Seattle First Nat'l Bank*, 563 F.2d 1377, 1382 (9th Cir.1977), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978). He concluded that the transaction at issue here "represents nothing more than the negotiation of evidences of debt and the sale of real estate loans, which is expressly authorized under 12 U.S.C. §§ 24 (Seventh) and 371(a)."

Alternatively, the Comptroller concluded that use of the pass-through certificate mechanism to sell mortgages is an "incidental power[ ]" of SPN Bank. *See* 12 U.S.C. § 24 (Seventh). In *Arnold Tours, Inc. v. Camp*, 472 F.2d 427, 432 (1st Cir. 1972), the First Circuit examined several Supreme Court decisions [5] and concluded from them that

> a national bank's activity is authorized as an incidental power, "necessary to carry on the business of banking," within the meaning of 12 U.S.C. § 24, Seventh, if it is convenient or useful in connection with the performance of one of the bank's established activities pursuant to its express powers under the National Bank Act. If this connection between an incidental activity and an express power does not exist, the activity is not authorized as an incidental power.

The Comptroller noted the OCC's position that the "convenient [and] useful" test of *Arnold Tours* is overly restrictive of the powers of national banks. Nevertheless, the Comptroller concluded that sale of the pass-through certificates satisfied even the

**5.** *Franklin National Bank v. New York*, 347 U.S. 373, 375–77, 74 S.Ct. 550, 552–53, 98 L.Ed. 767 (1954); *First National Bank*, 273 U.S. at 559–60, 47 S.Ct. at 466; *Clement National Bank v. Vermont*, 231 U.S. 120, 139–40, 34 S.Ct. 31, 36–37, 58 L.Ed. 147 (1913); *Miller v. King*, 223 U.S. 505, 510–11, 32 S.Ct. 243, 243–44, 56 L.Ed. 528 (1912); *Wyman v. Wallace*, 201 U.S. 230, 243, 26 S.Ct. 495, 497, 50 L.Ed. 738 (1906); *First National Bank v. National Exchange Bank*, 92 U.S. 122, 127, 23 L.Ed. 679 (1875); *Merchants' Bank v. State Bank*, 77 U.S. (10 Wall.) 604, 19 L.Ed. 1008 (1871).

*Arnold Tours* test. Emphasizing the increased marketability of mortgages packaged in the form of pools, the Comptroller said "the process of pooling bank assets and selling certificates representing interests therein can be 'convenient [and] useful' to a bank's ability to sell its assets." That is, because the pass-through certificate mechanism is a "convenient [and] useful" means for carrying out the express power of selling mortgages, SPN Bank's sale of the certificates falls within the "incidental powers" of the national bank under 12 U.S.C. § 24 (Seventh). *See M & M Leasing,* 563 F.2d at 1382–83.

> The Comptroller thus concluded that whether [SPN] Bank's use of the mortgage-backed pass-through certificate is viewed as a new way of selling bank assets or as an activity incidental to an authorized banking practice, we are satisfied that the issuance and sale of participation interests in pooled bank mortgage assets is permitted under 12 U.S.C. § 24 (Seventh).

### 3. *The Prohibitions and Concerns of the Glass–Steagall Act Are Not Implicated*

The Comptroller then stated that "[b]ecause the sale of bank assets through this medium is authorized under the national banking laws, the prohibitions of the Glass–Steagall Act are inapplicable to this transaction." Nevertheless, the Comptroller went on to argue that, even if the Glass–Steagall prohibitions were to be applied, they would not forbid this transaction.

First, the Comptroller found that SPN Bank's program did not involve "securities" within the meaning of the Glass–Steagall Act. The Comptroller noted that SPN Bank's registration of the offering with the Securities and Exchange Commission (SEC) did not mean that the certificates were "securities" for purposes of the Glass–Steagall Act. *See Investment Co. Inst. v. Clarke,* 630 F.Supp. 593, 594 n. 2 (D.Conn.), *aff'd,* 789 F.2d 175 (2d Cir.) (per curiam), *cert. denied,* 479 U.S. 940, 107 S.Ct. 422, 93

L.Ed.2d 372 (1986); *see also Conover,* 790 F.2d at 933. The Comptroller wrote:

> Th[e OCC] has previously considered pass-through certificates representing undivided interests in pooled bank assets to be legally transparent for purposes of the Glass–Steagall analysis. In other words, because the certificateholders have essentially the same rights, liabilities, and risks as if they were the owners of the underlying assets, the certificates are considered to be substantially the same as those assets.... To the extent that the participation certificates represent "investment opportunities", the opportunity being offered is, in substance, no different than the opportunity of investment in the underlying loans which banks are clearly authorized to sell.

The means used to pool and package the sale of the mortgages was thus thought not to transform the transaction into a sale of "securities." Finally, the Comptroller reinforced his interpretation of the term "securities" by referring to his finding that the "subtle hazards" identified by the Supreme Court as motivating the Glass–Steagall Act were not implicated by this transaction. *See infra.*

The Comptroller next concluded that even if the mortgage pass-through certificates are considered "securities" for purposes of the Glass–Steagall Act, the Act was still not violated here because SPN Bank's activities did not fall within the meaning of "dealing" or "underwriting" securities, as prohibited by section 16. In concluding that SPN Bank was not "dealing" or "underwriting" here, the Comptroller said:

> An issuer that merely participates in the initial placement of its own securities with investors, and does not subsequently engage in the business of repurchasing those securities, does not thereby enter into the "business of underwriting" nor does it become involved in the "business of dealing." In this regard, we underscore the point that the activity in question is, in substance, a sale of [SPN] Bank's assets. [SPN] Bank is not in this transaction purchasing and selling secu-

rities of other issuers but, rather, is participating in the placement of certificates representing interests in its own assets. (footnotes omitted).

The Comptroller followed up on his section 16 analysis by recognizing that because SPN Bank's "activities are permissible under Section 16, there is no need to conduct any inquiry under Section 21 of the Act." He nevertheless concluded that if it were applied, section 21 would not prohibit the activity at issue here. In so finding, the Comptroller again emphasized that this transaction essentially involved only SPN Bank's sale of its own assets. Further, the Comptroller relied on the specific proviso in section 21 stating that "nothing in this paragraph shall be construed as affecting in any way such right as any bank . . . may otherwise possess to sell, without recourse or agreement to repurchase, obligations evidencing loans on real estate."

The Comptroller concluded by considering the purposes of the Glass–Steagall Act, finding that they were not implicated here. He first noted that the most obvious risks associated with banks participating in the securities business, *see Camp*, 401 U.S. at 630, 91 S.Ct. at 1098, were not present here because "[a]t no time will [SPN] Bank's resources be committed to any securities investment whatsoever, since the program involves only the sale of bank assets."

Turning to the "subtle hazards" identified by the Supreme Court, *see Bankers Trust I*, 468 U.S. at 145–47, 104 S.Ct. at 2983–84; *Camp*, 401 U.S. at 630–34, 91 S.Ct. at 1098–1100, the Comptroller first noted that SPN Bank's program "does not involve the marketing of bank customers' securities." Under these circumstances, he found, "the conflicts of interest identified by the Supreme Court . . . are simply not at issue." Because the bank has no "promotional interest" in customers' securities, it will not be tempted to make unsound loans to improve the success of the securities offerings. "Similarly, there is no possibility that the Bank might improperly advise its customers on how and when to issue securities in order to profit from the distribution process or to use the proceeds

in obtaining repayment on outstanding loans."

The Comptroller next turned to the possibility that SPN Bank would offer limited credit support for the offering. He noted that the Prospectus provided that such credit support could only be, at a maximum, ten percent of the aggregate principal balance. He noted that in the absence of the sale of the mortgage loans, SPN Bank would retain 100 percent of the associated credit risk. In light of this, he found it "difficult to conceive how a decision to provide credit support for no more than 10% of the initial aggregate principal balance of a pool comprised of these same assets could be the product of 'unsound' lending practices."

The Comptroller rejected the argument that permitting use of the pass-through certificate mechanism would affect the soundness of SPN Bank's mortgage lending practices. He concluded:

We think it extremely unlikely that a bank would engage in unsafe mortgage lending practices simply because of the possibility that the resulting mortgage loans might thereafter be placed in a pool and sold in certificate form. In this regard, at the time of origination, it will generally not be possible for the Bank to know whether a particular loan will be suitable for subsequent inclusion in a public offering. In addition, the Bank would have difficulty marketing the Certificates if the underlying mortgages were themselves unsound investments because the federal securities laws require full disclosure of all material facts concerning the Certificates and the offering. In short, the Bank does not stand to profit by making unsound loans with the intent of remarketing them to uninformed purchasers.

Finally, the Comptroller found that SPN Bank's program would not likely result in its making unsound loans to its own depositors so as to finance sale of the certificates. "[S]ince [SPN] Bank's objective is to sell the mortgage loans, it would hardly make economic sense for it to replace these assets with unsound loans acquired in the

process." The Comptroller found such a scenario equally irrational from the point of view of the depositor. Because service charges would be deducted from the "pass-through" payments, it would not make sense, the Comptroller thought, for the depositor to obtain a loan at a higher commercial rate so as to invest in the certificates.

E. *The Comptroller Correctly Determined That SPN Bank's Sale of the Certificates Was Within the "Business of Banking" and Therefore Did Not Violate the Glass–Steagall Act*

 As our review of the Comptroller's decision indicates, under his interpretation of the Glass–Steagall Act, the conclusion that SPN Bank's activity was authorized by the banking laws was sufficient to resolve the dispute. That is, once the Comptroller concluded that SPN Bank's activity was encompassed by its power "to carry on the business of banking," 12 U.S.C. § 24 (Seventh), he found it unnecessary to consider the application of the Glass–Steagall prohibition on national banks' "underwrit[ing] securities," *id.* The district court appeared to accept this reading of the banking laws, *see* 703 F.Supp. at 258 ("the Comptroller's analysis could end at this point, having determined that the offering of mortgage-backed securities is within SPN Bank's power under the national banking laws"), although, as we demonstrate below, the court's reasoning and resolution were not consistent with it.

We find support for the Comptroller's interpretation of section 16 in *Bankers Trust I*, 468 U.S. at 158 n. 11, 104 S.Ct. at 2990 n. 11. In that case, the Supreme Court considered a bank's efforts to enter the business of selling third-party commercial paper. *Id.* at 139, 104 S.Ct. at 2981. The Court held that the commercial paper was a "security" within the meaning of the

Glass–Steagall Act, thereby rejecting a decision of the Board of Governors of the Federal Reserve Board.[6] In the course of reaching this result, the Court rejected an argument made by the Board based on a provision in section 16 permitting a bank to "purchase for its own account investment securities." 12 U.S.C. § 24 (Seventh). The Board argued that if commercial paper were considered a "security" under the Glass–Steagall Act, then banks would not be permitted to purchase commercial paper for their own accounts. The Board argued that because banks had long purchased commercial paper for their own accounts with no suggestion of illegality, "the practice cannot be reconciled with § 16 unless commercial paper is not deemed a 'security.'" *Bankers Trust I*, 468 U.S. at 158 n. 11, 104 S.Ct. at 2990 n. 11.

Of crucial significance here is the Court's reasoning in rejecting the Board's argument. Justice Blackmun, writing for the Court, said

we find the Board's argument unpersuasive because it rests on the faulty premise that the process of acquiring commercial paper necessarily constitutes "the business of dealing" in securities. The underlying source of authority for national banks to conduct business is the first sentence of § 16, which originated as § 8 of the National Bank Act of 1864, ch. 106, 13 Stat. 101. That provision grants national banks the authority to exercise "all such incidental powers as shall be necessary to carry on the business of banking" and enumerates five constituent powers that constitute "the business of banking." One of those powers is "discounting and negotiating promissory notes." 12 U.S.C. § 24 Seventh. The Board appears to concede that the authority for national banks to acquire commercial paper is grounded in this authorization to discount promissory

**6.** Having determined that the commercial paper fell within the meaning of "securities," the Court remanded the case for a determination as to whether the bank's activity constituted "underwriting" under section 16 or "the business of issuing, underwriting, selling, or distributing" under section 21. 468 U.S. at 160 n. 12, 104

S.Ct. at 2991 n. 12. The Court of Appeals subsequently determined that the bank's activities were permitted under section 16. *Securities Indus. Ass'n v. Board of Governors*, 807 F.2d 1052 (D.C.Cir.1986), *cert. denied,* 483 U.S. 1005, 107 S.Ct. 3228, 97 L.Ed.2d 734 (1987).

notes.... *The subsequent prohibition on engaging in "[t]he business of dealing in securities" does not affect this authority; while the Glass–Steagall Act does not define the term "business of dealing" in securities, the term clearly does not include the activity of "discounting" promissory notes because that activity is defined to be a part of the "business of banking."* In short, the fact that commercial banks properly are free to acquire commercial paper for their own account implies not that commercial paper is not a "security," but simply that the process of extending credit by "discounting" commercial paper is not part of the "business of dealing" in securities.

*Id.* (emphasis added). The three dissenting Justices rejected this argument. *Id.* at 167 n. 8, 104 S.Ct. at 2995 n. 8 (O'Connor, J., dissenting).

We think the distinction drawn by the Court between the "business of banking" and the "business of dealing" under section 16 supports the Comptroller's approach to the issue presented in this case. The Court's reading of section 16 of the Glass–Steagall Act establishes the threshold question as whether the challenged activity of SPN Bank constitutes "the business of banking" or, instead, the "business of dealing in securities and stock." *See* 12 U.S.C. § 24 (Seventh). Activity that falls within the "business of banking" is not subject to the restrictions the latter part of section 16 places on a bank's "business of dealing in securities and stock." Thus, the issues concerning the definitions of "securities" and "underwriting" only become relevant if the activity constitutes the "business of dealing in securities and stock." If the activity constitutes the "business of banking," then the Glass–Steagall Act prohibitions SIA claims are violated here do not apply.

The Comptroller correctly concluded that SPN Bank has the express power under the national banking laws to sell its mortgage loans. In 1982, Congress amended 12 U.S.C. § 371(a) to provide that "[a]ny national banking association may make, arrange, purchase or sell loans or extensions of credit secured by liens on interests in real estate, subject to such terms, conditions, and limitations as may be prescribed by the Comptroller of the Currency by order, rule, or regulation." Legislative history indicates that the amendment was intended to "simplif[y] the real estate lending authority of national banks by deleting rigid statutory requirements. Section 403 [which amended 12 U.S.C. § 371] is intended to provide national banks with the ability to engage in more creative and flexible financing, and to become stronger participants in the home financing market." S.Rep. No. 536, 97th Cong., 2nd Sess. 27 (1982), *reprinted in* 1982 U.S.Code Cong. & Admin.News 3054, 3081; *see also id.* at 60, 1982 U.S.Code Cong. & Admin.News at 3114.

We need not consider the extent, nature or bases of national banks' powers to sell mortgages before this amendment, as we have no difficulty concluding that the amended 12 U.S.C. § 371(a) supports the Comptroller's conclusion that SPN Bank has the express power to sell its mortgage loans.

In determining that the use of mortgage pass-through certificates to sell mortgage loans fell within SPN Bank's "incidental powers" under 12 U.S.C. § 24 (Seventh), the Comptroller turned to the test adopted in *Arnold Tours*, 472 F.2d at 432. There, the First Circuit framed the inquiry as follows: in order to be authorized under section 16's "incidental powers" provision, a national bank's activity must be "convenient [and] useful in connection with the performance of one of the bank's established activities pursuant to its express powers under the National Bank Act." *Id.*

Although he applied the test of *Arnold Tours*, the Comptroller argued that that test is unnecessarily restrictive of the powers of national banks. The Comptroller argued that several of the Supreme Court decisions relied on by the First Circuit in *Arnold Tours* in fact indicate that more flexible standards have been used. *See Franklin National Bank v. New York*, 347 U.S. 373, 377, 74 S.Ct. 550, 553, 98

L.Ed. 767 (1954); *Colorado National Bank v. Bedford,* 310 U.S. 41, 50, 60 S.Ct. 800, 804, 84 L.Ed. 1067 (1940); *Clement National Bank v. Vermont,* 231 U.S. 120, 140, 34 S.Ct. 31, 37, 58 L.Ed. 147 (1913); *Wyman v. Wallace,* 201 U.S. 230, 243, 26 S.Ct. 495, 497, 50 L.Ed. 738 (1906); *First National Bank v. National Exchange Bank,* 92 U.S. 122, 127, 23 L.Ed. 679 (1876); *Merchants' Bank v. State Bank,* 77 U.S. (10 Wall.) 604, 648, 19 L.Ed. 1008 (1871). We have no need to address the Comptroller's position that the *Arnold Tours* test is overly restrictive, as we believe that the proper test is no more restrictive than *Arnold Tours* and we agree with the Comptroller that SPN Bank's activities here satisfied even the *Arnold Tours* test.

We have little difficulty concluding that SPN Bank's use of the pass-through certificate mechanism is "convenient [and] useful in connection with the performance of" its power to sell its mortgage loans. *See Arnold Tours,* 472 F.2d at 432. Indeed, SIA does not appear to argue otherwise. The pass-through certificate mechanism permits the bank to offer purchasers an interest in a pool of mortgage loans, rather than just single mortgage loans. The popularity of the mechanism confirms what seems apparent, that many investors who might be wary of the risk of investing in a single mortgage loan will be willing to invest in a pool of loans. With the increased marketability that pass-through certificates make possible comes increased liquidity, an important benefit as banks face the task of funding long term mortgage loans with short term deposits. We thus conclude that the Comptroller's view that SPN Bank's "incidental powers" authorized its activity in the transaction at issue here was reasonable.[7]

The Comptroller properly recognized that once he determined that SPN Bank's activity was authorized under section 16, he did not need to analyze the transaction under section 21. "[S]ection 21 cannot be read to prohibit what section 16 permits. . . .

Therefore, if we find that the [Comptroller] acted reasonably in concluding that section 16 permits [SPN Bank's] activities, that is the end of our analysis." *See Securities Industry Ass'n v. Board of Governors,* 807 F.2d 1052, 1057 (D.C.Cir.1986), *cert. denied,* 483 U.S. 1005, 107 S.Ct. 3228, 97 L.Ed.2d 734 (1987) (*Bankers Trust II*). This is so because section 21 "was not intended to require banks to abandon an accepted banking practice that was subjected to regulation under § 16." *ICI,* 450 U.S. at 63, 101 S.Ct. at 985; *see also Bankers Trust I,* 468 U.S. at 149, 104 S.Ct. at 2985 ("§ 16 and § 21 seek to draw the same line").

The language of section 21 supports this approach. The section imposes restrictions on those "engaged in the business of issuing, underwriting, selling, or distributing ... stocks, bonds, debentures, notes, or other securities." 12 U.S.C. § 378(a)(1). The section then contains two provisos. The first is that the section "shall not prohibit national banks ... from dealing in, underwriting, purchasing, and selling investment securities, or issuing securities, to the extent permitted to national banking associations by the provisions of section 24 of this title [section 16 of the Glass–Steagall Act]." *Id.* The second proviso states that "nothing in this paragraph shall be construed as affecting in any way such right as any bank ... may otherwise possess to sell, without recourse or agreement to repurchase, obligations evidencing loans on real estate." *Id.* The provisos, added as amendments in 1935, *see* Banking Act of 1935, Pub.L. No. 74–305, ch. 614, tit. III, § 303(a), 49 Stat. 684, 707, clarify the relationship between sections 16 and 21 and support the Comptroller's view that section 21 cannot be read to prohibit SPN Bank's activity, as it is permitted by section 16. *See Bankers Trust II,* 807 F.2d at 1057–58; *see also Citicorp,* 839 F.2d at 56, 60–61. That is to say, even if SPN Bank's activity here were to be considered "underwriting

---

**7.** Because we agree with the Comptroller's determination that SPN Bank's "incidental powers" authorized its activity here, we have no need to address the Comptroller's alternative finding that the activity was simply a "new way" of selling mortgages and therefore fell within the bank's express power to sell mortgages.

... securities," section 21 would not prohibit such activity if it were permitted under section 16, as we have found it to be.

### F. *The District Court's Reasoning in Rejecting the Comptroller's Decision Was Flawed*

In analyzing the SPN Bank transaction, the district court appeared to accept the Comptroller's view that SPN Bank has the express power to sell its mortgage loans. Nevertheless, the court focused on its view that in this transaction, the "trust constitutes a separate entity from the bank," and "the pool will have a life distinct from that of the bank." 703 F.Supp. at 259. The court therefore concluded that "there is no mere sale of assets and the general statutory banking powers are limited by specific statutory prohibitions." *Id.*

The district court was obviously correct in noting that this transaction was in some sense more than a "mere sale of assets" insofar as it involved the certificate mechanism. Nevertheless, the district court failed to consider a question that is critical under Glass–Steagall Act analysis. The district court did not consider whether, its novel characteristics notwithstanding, the offering by SPN Bank fell within the bank's "incidental powers," 12 U.S.C. § 24 (Seventh), powers that are "convenient [and] useful in connection with" SPN Bank's sale of mortgage loans, *see Arnold Tours*, 472 F.2d at 432. That is, the court did not assess the Comptroller's principal conclusion, that SPN Bank's activities fell within SPN Bank's authority to conduct the "business of banking" under section 16. Instead, after noting the characteristics that distinguish this transaction from the traditional sale of a single mortgage loan, the district court undertook to analyze whether SPN Bank's activity constituted "underwriting ... securities." But, as we have discussed, activities within the "business of banking" are not intended to be affected by the Glass–Steagall Act's section 16 prohibition on "underwriting ... securities." *See supra; Bankers Trust I,* 468 U.S. at 158 n. 11, 104 S.Ct. at 2990 n. 11.

Because we uphold the Comptroller's decision based on his determination that SPN Bank's activities were within the "business of banking" and therefore were not prohibited by the Glass–Steagall Act, it is unnecessary to consider whether the certificates were "securities" under the Act or whether SPN Bank's activities would constitute "underwriting" under the Act. Nevertheless, we note that the district court's conclusion that SPN Bank's activity constituted "prohibited underwriting of securities" under the Glass–Steagall Act, 703 F.Supp. at 260, cannot be sustained on its reasoning. In rejecting the Comptroller's decision, the district court appeared to give determinative significance to the sale of the mortgage loans under SPN Bank's plan, by means of the pool instead of individually. 703 F.Supp. at 259. The mere fact that the certificate mechanism was used to sell otherwise salable mortgage loans transformed the transaction, in the district court's view, into the unlawful "underwriting of securities." The district court erred in attributing such significance to SPN Bank's pooling of the mortgages and sale of certificates. Interestingly, the Court of Appeals for the District of Columbia Circuit, in upholding the legality of a bank's issuance of "units of beneficial ownership" in an investment trust of individual retirement accounts (IRA), rejected an argument that because the interests were "undivided and redeemable interest[s] in the assets of a common trust fund," they therefore necessarily were "securities" under the Glass–Steagall Act. In so holding, the Court said, in language relevant here,

> [i]f the term "security" were indeed interpreted [so] broadly, ... then any ownership interest in a bank's common trust fund would constitute a security, and all commingling of trust funds by national banks would be effectively prohibited. We are at a loss to determine how a national bank could pool the assets of various trusts without creating some kind of certificates or other instruments setting forth the ownership interests of

each of the participating trust assets. But such commingling ... has historically been permitted and is clearly sanctioned by *Camp*. *See* 401 U.S. at 624–25, 91 S.Ct. at 1095–96.

*Conover*, 790 F.2d at 931; *see also Investment Co. Inst. v. Clarke*, 793 F.2d 220, 221–22 (9th Cir.), *cert. denied*, 479 U.S. 939, 107 S.Ct. 422, 93 L.Ed.2d 372 (1986); *Investment Co. Inst. v. Clarke*, 630 F.Supp. at 595–96, *aff'd*, 789 F.2d 175. While we do not find these so-called "IRA cases" to be controlling here, we do see them as undermining the district court's rationale for concluding that SPN Bank's activity constituted "underwriting of securities."

The district court also concluded that "[r]ather than [being] merely a means to facilitate the bank's needed liquidity and capital, reliance on sales of mortgage-backed certificates ... gives rise to an interest in the success of the sales," and that such an interest conflicts with the intent behind the Glass–Steagall Act to separate commercial from investment banking. 703 F.Supp. at 260–61. Presumably, in contending that such an "interest in the success of the sales" conflicted with the intent behind the Glass–Steagall Act, the district court was referring to the conflict of interest that may arise with respect to a bank depositor when a bank serves in the dual role of both financial adviser and investment banker. *See Camp*, 401 U.S. at 633, 91 S.Ct. at 1100; *see also Bankers Trust I*, 468 U.S. at 146, 104 S.Ct. at 2984. We are unable to ascertain precisely what "promotional interest" implicating Glass–Steagall Act concerns the district court saw as arising under the SPN Bank program at issue in this case. *Cf. Camp*, 401 U.S. at 633, 91 S.Ct. at 1100.

Perhaps it may be said that when SPN Bank decides that it is in its interest to sell a particular mortgage loan, it has a "promotional interest" in selling that loan. But the bank has such an interest in promoting any banking service offered pursuant to its statutory powers. This says little more than that it is in the bank's interest to sell its mortgage loans, as it is authorized to do. The mere fact that the bank has an interest in seeing that its loans are sold does not implicate the "subtle hazard" of "promotional interest" protected against by the Glass–Steagall Act. *See id.* Nor do we see how any such "promotional interest" arises simply because the bank chooses to market its loans by means of mortgage pass-through certificates instead of selling them directly. If some conflict of interest is present in the bank's simultaneously advising its depositors on financial matters and selling mortgage pass-through certificates, that conflict is no less present where the bank sells single mortgage loans directly, instead of by means of pass-through certificates. We agree with the Comptroller's explanation of why the nature of the transaction makes it unlikely that SPN Bank will make unsound loans so as to encourage purchase of the certificates. *See Bankers Trust I*, 468 U.S. at 146–47, 104 S.Ct. at 2984. In sum, we accept as reasonable the Comptroller's analysis demonstrating why this transaction does not implicate the "subtle hazards" legislated against by Congress in the Glass–Steagall Act.

Finally, we note that the district court's analysis seemed primarily motivated by what it considered to be "the banking laws' purpose of protecting the investing public." 703 F.Supp. at 261. The concerns of the Glass–Steagall Act, however, focus not on protecting the "investing public," but rather on ensuring the stability of banks and protecting bank depositors. *See ICI*, 450 U.S. at 61, 101 S.Ct. at 984 ("It is familiar history that the Glass–Steagall Act was enacted in 1933 to protect bank depositors from any repetition of the widespread bank closings that occurred during the Great Depression."); *Camp*, 401 U.S. at 629–34, 91 S.Ct. at 1098–1100. The district court felt the need to protect those who purchase the mortgage pass-through certificates by assuring that they receive full disclosure. 703 F.Supp. at 261. Instead of basing its Glass–Steagall Act analysis on the protec-

tion of investors, the court should have focused on the consequences for SPN Bank and its depositors. Protection of the purchasers of the certificates is the concern of the securities laws.

SPN Bank concedes that it "concluded long before the Comptroller's June 1987 letter" that although sale of mortgage pass-through certificates was permitted under the Glass–Steagall Act, "securities law registration and disclosure were mandated." SPN accepts that, "pursuant to § 2(4) of the Securities Act of 1933, 15 U.S.C. § 77(b)(4) [ (1982) ]," its activity in this transaction renders it an "issuer" under the securities laws. Accepting the requirement of registering its certificates with the SEC, SPN Bank has done so. We understand that the other banks that have sold mortgage pass-through certificates have registered their certificates with the SEC as well. Investors concerned that SPN Bank's issue might be based on bad mortgage loans it wants to unload can turn to the SEC filing to assess such risks. To the extent that SPN Bank might seek to circumvent this scrutiny by noncompliance with the securities laws, investors' remedies lie in those laws. To whatever extent those looking to invest in mortgage pass-through certificates are accorded the protection of federal law, that protection must come from the securities laws and the remedies they provide, not from the Glass–Steagall Act.

■ Similarly, the district court's analysis as to why the certificates are "securities" under the Glass–Steagall Act unduly focused on securities laws cases. The district court criticized the Comptroller for not considering the "definition of a security." But the Glass–Steagall Act contains no such definition. *See Conover,* 790 F.2d at 933. Determining the meaning of the terms of the Glass–Steagall Act is a difficult task, one that often requires resort to the purposes behind Congress' enactment of the Glass–Steagall Act. *See, e.g., Bankers Trust I,* 468 U.S. at 149–60, 104 S.Ct. at 2985–91; *Camp,* 401 U.S. at 634–39, 91

S.Ct. at 1100–03; *Citicorp,* 839 F.2d at 56–62; *Conover,* 790 F.2d at 933–38. The Comptroller undertook such an analysis, but the district court did not, turning instead to an analysis of the meaning of "securities" in the securities law context. The district court's reasoning may demonstrate why registration of the certificates with the SEC is required under the securities laws, but that point is conceded by SPN Bank and has never been at issue in this case. Although analogies to the securities laws may be useful for purposes of ascertaining the meaning of terms under the Glass–Steagall Act, *see Bankers Trust I,* 468 U.S. at 150–52, 104 S.Ct. at 2986–87, the requirement that the certificates be registered under the securities laws does not make them "securities" under section 16 of the Glass–Steagall Act. *See Investment Co. Inst. v. Clarke,* 630 F.Supp. at 594 n. 2, *aff'd,* 789 F.2d 175; *see also Conover,* 790 F.2d at 933–34.

## CONCLUSION

The district court erred in rejecting the decision of the Comptroller that SPN Bank's issuance and sale of mortgage pass-through certificates was permitted under the Glass–Steagall Act. The Comptroller properly determined that SPN Bank's activity was within the "business of banking" under 12 U.S.C. § 24 (Seventh), and therefore was not prohibited by the Glass–Steagall Act. The judgment of the district court is vacated and this matter is remanded to the district court with instructions to dismiss the complaint.